668 So.2d 679 (1996)
Julian B. KRAFT; Falcon Food Service Company, Inc., Harold R. Newburg, Sea-Good Seafood, Inc., a Florida corporation, Seagood Trading Corporation, a Florida corporation, and Blaine H. Winship as partner of Winship & Byrne, Appellants/Cross-Appellees,
v.
Zelda Pincourt MASON, Appellee/Cross-Appellant.
No. 94-2544.
District Court of Appeal of Florida, Fourth District.
February 28, 1996.
Reconsideration and Clarification Denied April 19, 1996.
*681 Edward A. Marod of Edward A. Marod, P.A., West Palm Beach, for Appellants/Cross-Appellees-Julian B. Kraft and Falcon Foods Service Company, Inc.
John E. Swisher, St. Petersburg, for Appellants/Cross-Appellees-Harold R. Newburg, Sea-Good Seafood, Inc. and Seagood Trading Corporation.
Russell S. Bohn of Caruso, Burlington, Bohn & Compiani, P.A., and Richard S. Cohen, West Palm Beach, for appellee/cross-appellant.
HENNING, PATTI ENGLANDER, Associate Judge.

STATEMENT OF THE FACTS
Julian Kraft, Harold Newburg and their companies were plaintiffs in a federal antitrust suit in the mid-1980s. They were represented by a law firm which, after a time, told them that the firm would be required to settle the case or withdraw from representation unless fees and costs were paid. Without the financial wherewithal themselves, the plaintiffs sought financing from others.
First, Kraft approached a gentleman named Gross with a contract drafted by Kraft himself. The contract provided for an interest in the antitrust suit if Gross would obtain a bank loan and, in turn, lend the proceeds to the plaintiffs. Specifically, the terms were for 20% of the first $1,000,000 recovered, 6% of the next $4,000,000 recovered and 3% of any recovery in excess of $5,000,000 in exchange for a loan of $100,000. The plaintiffs were obligated to pay Gross the first $100,000 of any recovery, and Gross was obligated to utilize that $100,000 in reducing the loan principal. Additionally, the loan was guaranteed and interest payments would be paid by the borrowers. Gross declined to provide the financing.
Still needing the funds, Kraft sought help from his sister Zelda Mason. She reviewed the loan agreement (identical to the one Kraft had drafted for Gross) and after considering the matter for a few weeks agreed to lend her brother the money. She made no changes in the loan document. She believed that the $100,000 loan would be repaid and that she would receive interest payments on the loan. She was also obligated by the loan agreement to use the first $100,000 received by her to reduce the loan principal. She testified that her brother said any additional money received under the loan agreement was like "icing on the cake" for her. Mason did not consider it a necessary incentive for making the loan. She had no expectations as to any further recovery. Important for issues presented to this court, we note that the contract contained no fixed repayment dates.
Once Mason lent the money, the antitrust lawsuit continued. The law firm modified its agreement with Kraft and Newburg to a straight contingent fee agreement. Because of this, Mason actually bore the cost of the litigation with her $100,000 loan.
In 1987, there was a partial settlement of the antitrust litigation for $200,000. Mason received $85,000 to reduce her loan obligations with the bank; with agreement of all, $15,000 was paid to her prior attorney; and all agreed the remaining $15,000 principal would be paid from any later settlement.
In June of 1987, Kraft stopped making the contractually mandated interest payments. By October, Mason demanded in writing full payment of the principal and unpaid interest. Testimony reveals that Kraft had repudiated the contract because of an unrelated family dispute Kraft had with his sister. Mason did not file a lawsuit at that time.
Eventually in December 1992, the antitrust suit settled for $5,015,000. Although the attorneys notified Mason in writing that she was entitled to $355,450[1], no money was *682 actually disbursed at the direction of Kraft. He still believed he was entitled to a setoff for that family matter. Mason demanded her settlement proceeds and instituted this suit when she was not paid. The suit was defended on the basis that the original contract was champertous and usurious and that the suit had been filed outside the statute of limitations.
After a nonjury trial, the trial court entered final judgment on behalf of Mason rejecting all defenses. However, the trial judge rejected Mason's position that she was entitled to have her recovery based on the full settlement amount before deducting attorneys' fees. This is the appeal and cross-appeal to this court of those rulings.

MAINTENANCE AND CHAMPERTY
"Maintenance is an officious intermeddling in a suit which in no way belongs to the intermeddler, by maintaining or assisting either party to the action, with money or otherwise, to prosecute or defend it." 9 Fla.Jur.2d Champerty and Maintenance § 1 (1979). Under the modern view, "it is the act of one improperly, and for the purpose of stirring up litigation and strife, encouraging others either to bring [an] action[] or to ... defen[d a suit] which they have no right to make...." Id.
Champerty is a form of maintenance wherein one will carry on a suit in which he has no subject-matter interest at his own expense or will aid in doing so in consideration of receiving, if successful, some part of the benefits recovered. 14 C.J.S. Champerty and Maintenance § 1a (1991).
Historically, the common-law doctrines of champerty and maintenance arose in England from causes unique to society as it then existed. 14 Am.Jur.2d Champerty and Maintenance § 1 (1964). "The power of influential persons to whom rights of action were transferred in order to obtain their support and favor in suits brought to assert those rights was the cause of the rigid doctrine...." 14 C.J.S., supra, § 3. As civilization and law progressed, the need for these strict rules decreased. 14 Am.Jur.2d, supra, § 1. Today, none of the states adhere to the rigor of the original champerty and maintenance doctrines. Id.
Though Appellants argue to this court that we should follow the strict common-law definitions, the few cases in Florida on this subject support the more modern-day approach that officious intermeddling is a necessary element of champerty. We define officious as "offering unnecessary and unwanted advice or services; meddlesome, esp. in a highhanded or overbearing way." Webster's New World Dictionary 988 (2d col. ed. 1986).
In Brown v. Dyrnes, 109 So.2d 788 (Fla. 2d DCA 1959), the Second District Court determined there was sufficient evidence to support the jury's finding that the contract was champertous. The litigation in question was provoked by the champertor who unjustly aroused the suspicion of one litigant against the other. There, a widow inherited numerous parcels of real estate. Brown managed these properties for the husband and for the widow after her husband's death. Sometime later, the widow met the plaintiff/champertor and discussed the property. At the time she was content with the management services of Brown. The plaintiff/champertor, however, persuaded the widow to believe that Brown was profiting from the handling of her properties and that through a lawsuit she could recover a large judgment. Believing this, she contracted with the champertor, agreeing to pay him percentages of all properties and money recovered in the suit. Furthermore, if the suit settled without his consent, he would be paid for services rendered.
The litigation that ensued exonerated Brown, and the widow eventually had to pay him $10,000. Next, the champertor filed suit alleging that the widow owed him for his services in the unsuccessful litigation. This time, the widow prevailed. The Second District Court found the verdict could well be *683 sustained on the theory the contract was champertous.
This court in Anderson v. Trade Winds Enterprises Corp. 241 So.2d 174 (Fla. 4th DCA 1970), cert. denied, 244 So.2d 432 (Fla. 1971), accepted the definition of maintenance as stated above as well as the following definition of champerty: "`a bargain by a champertor with a plaintiff or defendant for a portion of the matter involved in a suit in case of a successful termination of the action, which the champertor undertakes to maintain or carry on at his own expense.'" 241 So.2d at 177 (quoting 14 Am.Jur. § 3 (1964)). After accepting these definitions, this court determined that the facts in that case could not "even remotely resemble maintenance or champerty. In the first place there was obviously no officious intermeddling by anyone in a law suit. In the second place there was no bargaining between any person not involved in a law suit to acquire an interest in a matter in litigation". 241 So.2d at 177 (emphasis added).
In the instant case, Mason clearly did not act in an officious manner. She was not intermeddling in a lawsuit. She did not instigate the litigation. Her assistance was sought out by Kraft when he needed money to continue his lawsuit. She did not bargain for the terms under which she made the loanthey too were prepared by Kraft. Nor did she concern herself with the antitrust litigation or impose her views upon the attorneys or the litigants once she provided the loan.
Accordingly, this court holds that the trial court correctly rejected the champerty argument raised below.

USURY
There are four requirements necessary to establish usury:
1. a loan, express or implied.
2. an understanding between the parties that the money loaned must be repaid.
3. In consideration of the loan, a greater rate of interest than is allowed by law is paid or agreed to be paid by the borrower.
4. a corrupt intent to take more than the legal rate for the use of the money loaned.
See Jersey Palm-Gross, Inc. v. Paper, 639 So.2d 664, 666 (Fla. 4th DCA 1994), app'd, 658 So.2d 531 (Fla.1995); 32 Fla.Jur. Interest and Usury § 52 (1994).
The main issue before this court is whether the trial court erred in determining that no corrupt intent existed to collect interest at a usurious rate. This court in Jersey provided a succinct background on usury relevant to this issue:
Civil usury involves loans of $500,000 or less and an interest rate of greater than 18% and less than 25%. See § 687.03, Fla.Stat. (1993). Criminal usury involves any loan amount with a rate of interest greater than 25% but not in excess of 45%. See § 687.071, Fla.Stat. (1993). The penalties for civil usury include forfeiture of all interest charged; the civil penalties for criminal usury are forfeiture of the right to collect the debt. See § 687.04, Fla.Stat. (1993). In the case of either criminal or civil usury, the lender's willfulness to charge an excessive interest rate is determined by considering all of the circumstances surrounding the transaction. This might involve looking beyond the terms of the loan documents. If a borrower promises or is otherwise required to pay a bonus or other consideration as an inducement to the lender to make the loan, such added obligations may be considered interest and can render a loan usurious.
639 So.2d at 667 (citations omitted).
In Jersey, the lender was to receive 15% interest on a loan of $200,000 for eighteen months. Shortly before closing on the loan, the lender insisted upon a 15% equity in the borrower's partnership. With the inclusion of the partnership interest, the interest rate on the loan was 45% per annum. The trial court found that the lender had knowingly and willingly charged a usurious rate.
This court affirmed and stated:
The determination of intent is the responsibility of the trier of fact..... The supreme court in Dixon [v. Sharp, 276 So.2d 817 (Fla.1973)] cited with approval *684 the definition of willfully and knowingly set forth in Chandler v. Kendrick, 108 Fla. 450, 146 So. 551, 552 (1993):
A thing is willfully done when it proceeds from a conscious motion of the will intending the result which actually comes to pass. It must be designed or intentional, and may be malicious, though not necessarily so.
We agree that mathematical calculations alone do not equate with usurious intent. However, here the lender knew at the outset the total value of the amount he was receiving in consideration for making the loan. Gross, the lender's president and sole stockholder, is a developer with 40 years experience and not an unsophisticated lender. He knew that the borrowers had an urgent need for the money. He dictated the terms of the loan. The fact that the borrowers were "in distress" or "necessitous" when the loan was made is as significant as the fact that the lender dictated the terms of the loan. Our supreme court explained the purpose of Florida's usury statute:
The very purpose of statutes prohibiting usury is to bind the power of creditors over necessitous debtors and prevent them from extorting harsh and undue terms in the making of the loans.
639 So.2d at 668 (citations omitted). The supreme court, in approving this court's opinion, further stated:
"[U]sury is largely a matter of intent, and is not fully determined by the fact that the lender actually receives more than law permits, but is determined by the existence of a corrupt purpose in the lender's mind to get more than legal interest for the money lent." Moreover, "the question of intent is to be gathered from the circumstances surrounding the entire transaction." Consequently, the ultimate arbiter on the issue of intent is the trial court because "the question of intent is one of fact."
658 So.2d at 534 (citations omitted).
The instant case appears to be the antithesis of Jersey. Here, Mason was an unsophisticated lender. She did not know at the outset the total amount she would receive. The evidence is uncontroverted that it was the borrowers who dictated the terms of the loan, not Mason. The loan was to be paid back after the disposition of the lawsuit. Accordingly, no one could have known at the loan's inception the total amount Mason would be receiving in consideration for making the loan. Clearly, the record does not demonstrate the necessary "`corrupt purpose in the lender's mind to get more than legal interest....'" Jersey, 658 So.2d at 534 (quoting Dixon, 276 So.2d at 820). This is not a case of an overreaching lender taking advantage of a desperate borrower to impose undue or harsh terms.
Yet another reason the loan was not usurious is that the money to be paid Mason could be characterized as a bonus to be received for participating in an uncertain transaction. A loan agreement is not usurious when payment depends upon a contingency. See, e.g., Bailey v. Harrington, 462 So.2d 861 (Fla. 3d DCA), rev. denied, 472 So.2d 1180 (Fla.1985), and rev. denied sub nom., N-Site Associates v. Harrington, 472 So.2d 1181 (Fla.1985); Schwab v. Quitoni, 362 So.2d 297 (Fla. 3d DCA 1978). Here, when the loan was given, any talk of recovery was pure speculation. Quite possibly, there would be no successful recovery from the antitrust litigation, and Mason might have collected nothing beyond the pay back of the loan. This contingent nature of any "interest" to Mason makes the agreement non-usurious.
Thus, the trial court's finding that the usury defense was inapplicable was correct and is affirmed.

STATUTE OF LIMITATIONS
We write briefly on this issue to affirm the trial court's finding that the statute of limitations did not commence as to the shares of the recovery and the $15,000 in unpaid principal until the settlement of the underlying antitrust case in December 1992. It did expire as to some unpaid interest payments on the principal as Mason concedes and as the trial court correctly held. When interest payments are payable in installments, the statute of limitations can run on some but not others. See Hannett v. Bryan, 640 So.2d 203 (Fla. 4th DCA 1994); Central *685 Home Trust Co. v. Lippincott, 392 So.2d 931 (Fla. 5th DCA 1980).

CALCULATING SHARES OF THE RECOVERY
Paragraph 6 of the Loan Agreement reads as follows:
6. In consideration of the above, Borrowers hereby direct Winship & Byrne to pay to Lender the following percentages of any Recovery by plaintiffs in the Lawsuit: 20 percent of the first $1,000,000.00 of any Recovery; 6 percent of the next $4,000,000.00 of any Recovery; and 3 percent of any additional Recovery. The term "Recovery", as used herein, means the proceeds received from any settlement in plaintiffs' favor of any claims brought by them in the Lawsuit and the proceeds received from any judgment awarding damages to plaintiffs in the Lawsuit, including any amount obtained by reason of trebling of damages or punitive damages, but excluding any award of costs, interest or attorneys fees. Any payment made to Lender by Winship & Byrne in accordance with the provisions of this paragraph shall be made from the net proceeds of any settlement and/or judgment payable to Borrowers, and not from the portion payable to Winship & Byrne. Notwithstanding the above, the first $100,000 of any Recovery shall be paid by Winship & Byrne to Lender for the purpose of enabling Lender to pay off the principal amount of the loan, with said $100,000 to be credited against Lender's 20 percent share of the first $1,000,000.00 of any Recovery.
The trial court interpreted this provision as requiring Mason's share to be calculated on the net proceeds of the settlement after attorneys' fees had been deducted from the gross amount. Mason argues that the trial court's interpretation is wrong. We agree with Mason.
A careful reading shows that the portion of the paragraph defining "Recovery" relates to the calculation of the lender's share. Once calculated, the remainder of the paragraph defines how the calculated amount is to be paid. Payment to the lender is to come from the proceeds of the settlement to which the borrowers are entitled after attorneys' fees are deducted and paid to the lender from Kraft and Newburg's recovery proceeds and not from the share due the attorneys (Winship & Byrne). The loan agreement does not require that the Lender's share be calculated from that reduced amount.
The well-formed law on contract construction is dispositive of this issue. Clear and unambiguous contract terms should be construed as written. Institutional & Supermarket Equipment, Inc. v. C & S Refrigeration, Inc., 609 So.2d 66 (Fla. 4th DCA 1992). Extrinsic evidence regarding a contract's meaning should not be admitted if the contract is not ambiguous. J.C. Penney Co., Inc. v. Koff, 345 So.2d 732 (Fla. 4th DCA 1977).
"[T]he construction placed on the terms of an agreement by a trial court must be accepted by a reviewing court unless the construction is clearly erroneous." Elmore v. Enterprise Developers, Inc., 418 So.2d 1078, 1079 (Fla. 4th DCA 1982). Here, the trial court clearly erred in finding the agreement ambiguous. Its interpretation of the agreement based on evidence taken at trial need not and should not be accepted by this court. To do so would be to rewrite a contractual provision or vary a party's obligations under a clearly written contract. This is impermissible under the law. See Koff.
Moreover, even had there been an ambiguity in the contract the record unequivocally confirms that the agreement was drafted by one of the borrowers and so should be construed against them and in favor of the lender. See Home Savings of America, F.A. v. Roehner, 491 So.2d 612 (Fla. 4th DCA 1986); Finlayson v. Broward County, 471 So.2d 67 (Fla. 4th DCA 1985).
On this point, then, the case must be remanded to the trial court for calculations of an award to Mason consistent with this opinion.

*686 CONCLUSION

Because this court holds that the trial court correctly found the contract in issue was neither champertous nor usurious and that the suit was not filed beyond the statute of limitations, the case is affirmed on those issues. Because the trial court erred in calculating the recovery to which Mason is entitled, the case is reversed on that issue.
AFFIRMED, in part; REVERSED in part and REMANDED.
GUNTHER, C.J., and SHAHOOD, J., concur.
NOTES
[1] This amount was calculated by Kraft's attorney pursuant to paragraph 6 of the loan agreement by taking 20% of the first $1 million ($200,000), 6% of the next $4 million ($240,000) and 3% of the remaining $15,000 ($450) less the $85,000 previously paid to Mason. Interestingly, this original calculation is the calculation demanded by Mason at trial and before this court on appeal, but rejected by the defendants and trial court below.