**ANGLO–DUTCH PETROLEUM INTERNATIONAL, INC. and Anglo–Dutch (Tenge) LLC, Appellants,**

**v.**

**John HASKELL, Chris Scully, Chris O'Sullivan, Charles McCord III, the Sheriff Family LLC, and Law Funds, LLC f/k/a Amicus Legal Funding, LLC, Appellees.**

No. 01–05–00179–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 9, 2006.

Rehearing Overruled May 2, 2006.

---

Bradley Wayne Hoover, Virginia Mixon Swindell, Jack C. Nickens, Jr., Nickens, Keeton, Lawless, Farrell & Flack, LLP, Bryon C. Keeling, Keeling & Downes, P.C., Sanford L. Dow, Dow Golub Berg & Beverly, LLP, Houston, for Appellants.

Cynthia Hollingsworth, Gardere & Wynee, L.L.P., Dallas, Geoffrey H. Bracken, Gardere Wynne Sewell, L.L.P., Houston, for Appellees.

Panel consists of Chief Justice RADACK and Justices JENNINGS and ALCALA.

## OPINION

TERRY JENNINGS, Justice.

Appellants, Anglo–Dutch Petroleum International, Inc. and Anglo–Dutch (Tenge) LLC (collectively, "Anglo–Dutch"), challenge the trial court's rendition of summary judgment [1] in favor of appellees, John Haskell, Chris Scully, Chris O'Sullivan, Charles McCord III, the Sheriff Family LLC, and Law Funds, LLC f/k/a Amicus Legal Funding, LLC, in appellees' breach of contract suit arising out of multiple litigation funding agreements executed by Anglo Dutch and appellees. In its first and second issues, Anglo–Dutch contends that the trial court erred in granting summary judgment in favor of appellees because the evidence raises a genuine issue of material fact as to whether appellees charged Anglo–Dutch a usurious rate of interest in the agreements and whether the agreements were illegal, unregistered securities. In its third issue, Anglo–Dutch contends that the trial court erred in granting summary judgment in favor of appellees because the agreements violated Texas public policy. In its fourth issue, Anglo–Dutch contends that the trial court erred in awarding appellees their attorneys' fees and costs because appellees were not entitled to summary judgment. We affirm.

## Factual and Procedural Background

In 2000, Anglo–Dutch filed suit against "Halliburton" and "Ramco" (the "Halliburton lawsuit") alleging that Halliburton and Ramco misappropriated Anglo–Dutch's trade secrets and breached their confidentiality agreements with Anglo–Dutch, which were executed by the parties during the course of developing an oil and gas field.[2] Anglo–Dutch sought damages in the amount of $650 million allegedly "for the profits it would have earned" if Halliburton and Ramco had not breached their confidentiality agreements and misappropriated Anglo–Dutch's trade secrets. Anglo–Dutch retained attorneys John O'Quinn, John L. McConn Jr., and Jett Williams III to represent it in the Halliburton lawsuit.

Due to the expense associated with prosecuting the Halliburton lawsuit, and in order "to operate its business, to retain its employees, and to avoid bankruptcy until it could recover a judgment from Halliburton and Ramco," Anglo–Dutch needed to raise money. Anglo–Dutch initially, but unsuccessfully, sought to borrow money from commercial banks, using the Halliburton lawsuit as collateral. As appellees allege in their petition, Anglo–Dutch then con-

---

1. See Tex.R. Civ. P. 166a(c).

2. Anglo–Dutch states that this case was styled *Anglo–Dutch (Tenge) LLC et al. v. Ramco Oil & Gas, Ltd. et al.*, Cause No. 2000–22588, in the 61st Judicial District Court of Harris County. Neither party provides us with the record of this lawsuit, nor do the parties clearly identify the corporate entities sued in this lawsuit. Thus, based on the parties' representations, we have identified the parties as "Halliburton" and "Ramco."

tacted multiple parties, including appellees, and solicited investments in the Halliburton lawsuit. Based upon Anglo–Dutch's express written and oral representations concerning the possible returns on their investments, appellees agreed to invest monies, at least in part, to fund the Halliburton lawsuit. Pursuant to the terms of multiple Claims Investment Agreements, appellees invested a total of approximately $560,000. These agreements defined the terms of the parties' relationships and set forth the formulas for calculating any returns appellees would be entitled to receive in the event that Anglo–Dutch obtained a cash recovery in the Halliburton lawsuit. Appellees assert that, by executing these agreements, they obtained a preferential right of recovery in Anglo–Dutch's settlement proceeds in the Halliburton lawsuit.

After the Halliburton lawsuit was tried to a jury, the trial court entered a judgment in the amount of approximately $81 million, including approximately $10 million in attorneys' fees, against Halliburton and Ramco. Anglo–Dutch and Halliburton subsequently entered into a settlement agreement, the terms of which are undisclosed.[3] Following Anglo–Dutch's and Halliburton's settlement, Anglo–Dutch sent each appellee a letter in which it disputed the validity of the litigation funding agreements and asserted that the agreements were "contrary to Texas public policy" and "unenforceable under Texas law." Consequently, Anglo–Dutch requested that appellees accept a reduced payment contrary to the terms of the agreements.

Appellees refused Anglo–Dutch's offer of reduced payments and filed the instant suit against Anglo–Dutch, asserting claims for breach of contract, fraud, breach of fiduciary duty, conspiracy, and conversion.[4] Appellees then filed a summary judgment motion on their breach of contract claim, in which they asserted that they were entitled to judgment as a matter of law because, per the terms of the litigation funding agreements, following receipt of the settlement proceeds from Halliburton, Anglo–Dutch's "disbursement of such funds to [appellees] ... per their secured, preferential right to first recovery of their investments was to be made by [Anglo–Dutch] as a ministerial act." In support of their motion, appellees attached their own affidavit testimony and documentary evidence, including a solicitation letter sent from Anglo–Dutch to appellee John Sheriff. Appellees testified that, after filing the Halliburton lawsuit, Anglo–Dutch began soliciting investments in the Halliburton lawsuit and that the proposed investments were structured as preferential partial assignments of Anglo–Dutch's recovery in the Halliburton lawsuit. Appellees further testified that Anglo–Dutch induced appellees to invest in the Halliburton lawsuit by providing them with written and/or oral representations and warranties concerning the nature of the allegations in the lawsuit, the experience of the plaintiff's counsel and their accomplishments in prior litigation, and the return of the investment offered to investors. In its letter to Sheriff, Anglo–Dutch outlined its need to raise "plaintiff funding" and recognized that such funding "is expensive fi-

3. At argument, the parties represented that Anglo–Dutch's judgment against Ramco is still pending on appeal.

4. Appellees also sought a temporary restraining order and temporary injunction against Anglo–Dutch, enjoining Anglo–Dutch from disbursing or transferring proceeds from its Halliburton settlement. The trial court granted appellees a temporary restraining order, and Anglo–Dutch deposited an amount sufficient to cover appellees' actual damages into the trial court's registry.

nancing, but affordable if the anticipated recovery is large enough." Anglo–Dutch detailed the history of its dispute with Halliburton, stated that it was suing for $680 million plus punitive damages, noted that Texas law "is favorable" to the types of claims it was asserting, and described the qualifications of its trial counsel. Anglo–Dutch also attached to its letter to Sheriff a copy of a Claims Investment Agreement. Appellees asserted that Anglo–Dutch made similar solicitations to all appellees.

Appellees also attached to their summary judgment motion copies of the Claims Investment Agreements and the Assignments of Cash Recovery executed by each appellee and by Anglo–Dutch. While the agreements differed in some respects, including the amount of the investment and the amount of any return, all of the agreements were similarly structured. The agreements generally referred to each appellee as an "Investor" and characterized each investor as being a first, second, third, or fourth tier investor, depending on certain variables, such as the date of investment. The appellees' "investor's rights" were determined by their assigned tier and a payment schedule included in the agreements.

The agreements uniformly provided that Anglo–Dutch was "selling interests in any Cash Recovery ... that it may receive from the [Halliburton] lawsuit." The agreements also stated:

*Payments by Anglo–Dutch to Investor.* If and only if, a final disposition or settlement of the Lawsuit results in a Cash Recovery to Anglo–Dutch, Anglo–Dutch shall pay (or cause to be paid) to Investor the sum total of:

> (a) its Investment, plus,
>
> (b) an amount equal to its Investment, plus
>
> (c) a return on its Investment (hereinafter referred to as the "Investor's Return")[5] ....

. . . .

If a final disposition or settlement of the Lawsuit fails to result (for whatever reason) in a Cash Recovery, then Anglo–Dutch shall have no obligation to make any payment to Investor for any portion of the Investor's Total Return. If the Cash Recovery received by Anglo–Dutch is insufficient to pay all of the Investor's Total Return, Anglo–Dutch shall pay (or cause to be paid) to Investor from the Cash Recovery, only the portion of Investor's Total Return as is possible by applying all of Anglo–Dutch's portion of the Cash Recovery in accordance with the Order of Payments Schedule ... after which Anglo–Dutch shall have no further liability or obligation to Investor for any portion of its Investor's Total Return remaining unpaid.

. . . .

**5.** The formula used to calculate the "Investor's Total Return" varied from agreement to agreement. For example, in some agreements, subpart (b) provided for an amount equal to 200% of the initial investment while in other agreements subpart (b) provided for an amount equal to 85% of the initial investment. Subpart (c) also varied from agreement to agreement. For example, in some agreements, subpart (c) provided for an amount equal to the amount of the loan multiplied by the number of days from the date of the loan to the date of the disposition of the Halliburton lawsuit divided by 365. In other agreements, subpart (c) provided for an amount equal to the amount of the loan multiplied by the number of days from the date of the loan to the date of the disposition of the Halliburton lawsuit divided by 365, and multiplied by 85%. Anglo–Dutch notes that the "driving factor" in determining the Investor's Total Return is the amount of time that has elapsed since the date of the investment.

*Order of Payments Schedule.* .... It is further understood that Investor shall have no claim or right to any portion of the Cash Recovery due or payable to any attorneys retained at any time by Anglo–Dutch.

....

*Time of Payment.* If and when a final disposition or settlement of the Lawsuit results in a Cash Recovery, Anglo–Dutch shall pay (or cause to be paid) to Investor all (or the proportionate share, as the case may be) of its Investor's Total Return in accordance with the Order of Payments Schedule within ten (10) days following Anglo–Dutch's receipt of such Cash Recovery. If such Cash Recovery is received by Anglo–Dutch in installments over time, then Anglo–Dutch (if necessary, because the amounts of such installments are insufficient to pay all the Investor's Total Returns) shall pay Investor its respective Investor's Total Returns in installments (over the same period of time) in accordance with the Order of Payments Schedule, until such time as the Investor's Total Returns (or its proportionate share thereof) shall have been paid in full.

The agreements further provided that in the event of Anglo–Dutch's bankruptcy, the investor's interest in any cash recovery would not be described as a debt or obligation of Anglo–Dutch. An Assignment of Cash Recovery was attached to each agreement, providing each investor with a security interest in any cash recovery received by Anglo–Dutch. The assignments stated that "Anglo–Dutch hereby assigns, transfers, and sets over to Investor its proportionate share of Anglo–Dutch's right, title and interest in and to any Cash Recovery ... actually received by Anglo–Dutch from the [Halliburton] Lawsuit ... as continuing and collateral security for

the payment of obligation due and owing by Anglo–Dutch to Investor."

Also attached to appellees' summary judgment motion were letters from Anglo–Dutch to appellees, which were sent after entry of the judgment against Halliburton and Ramco and after Anglo–Dutch concluded its settlement with Halliburton, requesting that appellees accept a lower payment than was provided for in the agreements. In these letters, Anglo–Dutch claimed that appellees' refusal to accept its proposed lower payment "put at risk Anglo–Dutch's ability to resolve the Lawsuit with Halliburton" and asserted that the agreements were contrary to Texas public policy and unenforceable. With these letters, Anglo–Dutch enclosed checks for the amount of the reduced payments and stated that, by depositing the checks, appellees would be releasing Anglo–Dutch from any future liability. The appellees refused to accept the reduced payments.

In its response to appellees' summary judgment motion, Anglo–Dutch contended that (1) the litigation funding agreements were usurious loans, (2) if the agreements were not loans, they were illegal, unregistered securities, and (3) the agreements violated Texas public policy. In support of its argument that appellees' investments were actually usurious loans, Anglo–Dutch asserted that appellees "understood that Anglo–Dutch was virtually certain to recover in the lawsuit at least an amount sufficient to repay the principal advanced by [appellees]," that appellees were "in the business of evaluating and financing lawsuits," and that, at a minimum, "there [was] a genuine issue of material fact regarding whether Anglo–Dutch's obligation to repay was absolute." Anglo–Dutch attached to its response the affidavit of Scott Van Dyke, president of Anglo–Dutch, who testified that, during the prosecution of the

Halliburton lawsuit, Anglo–Dutch needed to raise money to operate its business and avoid bankruptcy, that Anglo–Dutch made unsuccessful attempts to borrow money from commercial banks and other lenders, and that he learned that certain parties were willing to "loan funds to plaintiffs in lawsuits with repayment to be made out of such plaintiff's recovery." Van Dyke stated that he had conversations with each of the appellees regarding "the proposed transaction where they would loan Anglo–Dutch money and be repaid from Anglo–Dutch's recovery in the Halliburton lawsuit." In entering into these "proposed loan transactions" with appellees, Van Dyke presented the appellees with the Claims Investment Agreements, which Van Dyke stated were form documents that had been provided to him by another lender who had previously furnished Anglo–Dutch funds during the pendency of the Halliburton lawsuit.

Van Dyke also testified in support of Anglo–Dutch's specific contentions that, at the time the agreements were executed, "[appellees] expected their loans to be repaid," that the parties "considered Anglo–Dutch's recovery to be quite certain," and that the contingency of repayment expressed in the agreements was "in reality non-existent." Specifically, Van Dyke testified that "[d]uring discovery, counsel for Anglo–Dutch found numerous documents and obtained testimony which conclusively established that the confidentiality agreements had been breached" and that "damages were effectively established by Halliburton's and Ramco's own documents." Van Dyke also testified that, during his conversations with appellees, he described to appellees the details of the Halliburton lawsuit and showed them the relevant evidence. He explained to appellees "that there was no risk to their principal" because (1) the evidence "showed that Halliburton and Ramco had breached their confidentiality agreements," (2) Halliburton's own "economic model showed that the interest . . . lost as a result of the breach by Halliburton and Ramco was valued . . . at hundreds of millions of dollars," and (3) Anglo–Dutch's lawyers "had an excellent track record of settling or winning cases." Van Dyke further testified that he assured appellees that "the facts relating to the Halliburton lawsuit were such that [he] and [his] able trial counsel were confident that recovery of an amount sufficient to repay them and others who had or would loan funds to Anglo–Dutch was not speculative" and that he "understood at the time and [he] expressed to each of the [appellees] that Anglo–Dutch had an absolute obligation to repay them." Finally, Van Dyke testified that Anglo–Dutch recorded these agreements as loans and as borrowed funds.[6] Anglo–Dutch also attached to its response the affidavit of David Leathers, a financial expert, who testified that he reviewed the Claims Investment Agreements and Assignments of Cash Recovery, as well as other documentary evidence, that it was his "understanding that Anglo–Dutch was obligated to pay (or cause to be paid) to each Investor an amount defined as the 'Investor's Total Return,'" and that he determined that the annual interest rate on the "Investor's Total Returns" ranged from 62% to 186%.

The trial court granted appellees' summary judgment motion and ordered that appellees recover from Anglo–Dutch $2,556,105.51 in actual damages plus $52,001.80 in attorneys' fees. The trial court then severed appellees' breach of

---

**6.** Van Dyke does not offer detailed testimony concerning the time line of events, i.e., the date each appellee invested and the status of Anglo–Dutch's claims at the time each appellee invested.

contract claim from their remaining claims, creating a final and appealable judgment.

## Standard of Review

■ The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to summary judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). A plaintiff moving for summary judgment on its claim must establish its right to summary judgment by conclusively proving all the elements of its cause of action as a matter of law. *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex.1999). If a defendant wishes to assert an affirmative defense to the summary judgment motion, it must urge the defense in its response and provide enough summary judgment evidence to create a fact issue on each element of the defense. *Beathard Joint Venture v. W. Houston Airport Corp.*, 72 S.W.3d 426, 434 (Tex.App.-Texarkana 2002, no pet.); *Jones v. Tex. Pac. Indem. Co.*, 853 S.W.2d 791, 795 (Tex.App.-Dallas 1993, no writ). A nonmovant asserting an affirmative defense is not required to prove the affirmative defense as a matter of law-raising a fact issue is enough. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex.1984). In conducting our review, we assume that all evidence favorable to the nonmovant is true and indulge every reasonable inference and resolve all doubts in favor of the nonmovant. *Nixon*, 690 S.W.2d at 548–49.

## Usury

■ In its first issue, Anglo–Dutch argues that the trial court erred in granting summary judgment in favor of appellees because the evidence raises a genuine issue of material fact as to whether appellees charged Anglo–Dutch a usurious rate of interest in the agreements. Anglo–Dutch urges this Court to "look beyond the language" of the agreements to determine the parties' intent. Anglo–Dutch asserts that the summary judgment evidence shows that "the alleged contingency was not a real contingency and, therefore, the parties intended their agreements to be loans, which Anglo–Dutch had an absolute obligation to repay." Anglo–Dutch further asserts that, in considering its usury allegations, parol evidence is admissible to establish that the parties intended their transactions to be loans and that such extrinsic evidence, contradicting the terms of an agreement, may be considered in determining if an agreement is usurious. Anglo–Dutch notes that, despite the terms of the agreements, Van Dyke testified that he and appellees understood the agreements to be loans, that Anglo–Dutch believed it had an absolute obligation to repay the principal on the loans, and that appellees understood that their agreements "were not speculative" and involved "no risk." Alternatively, Anglo–Dutch argues that even if there was a "real contingency" in the agreements, the agreements were still usurious because, once Anglo–Dutch settled with Halliburton, it had an absolute obligation to repay appellees.

Appellees contend that, based on the "specific and unambiguous terms" of the agreements, repayment of their investments was based on an absolute contingency, the transactions were not loans, and usury laws do not apply. Appellees note that the agreements do not describe the investments as loans, do not use the word interest, do not state an interest rate, and do not provide a specific repayment date for a sum certain. Appellees further note that the Halliburton lawsuit was a "highly complex, multi-party commercial lawsuit that took over three years of extensive discovery and contested motion practice before it even reached a nine week trial," that some appellees invested only four

months into the suit, and that all appellees invested during the lengthy discovery process, when the outcome of the lawsuit was unpredictable and uncertain. Appellees assert that, despite Anglo–Dutch's usury allegations, parol evidence is not admissible to directly contradict the terms of the agreement, and further assert that, even if Van Dyke's affidavit and Anglo–Dutch's other evidence are considered, there is still no question of fact to defeat the summary judgment on Anglo–Dutch's usury defense.

The essential elements of a usurious transaction are "(1) a loan of money, (2) an absolute obligation to repay the principal, and (3) the exaction of a greater compensation than allowed by law for the use of the money by the borrower." *First Bank v. Tony's Tortilla Factory, Inc.*, 877 S.W.2d 285, 287 (Tex.1994); *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex.1982); *Oyster Creek Fin. Corp. v. Richwood Invs. II, Inc.*, 176 S.W.3d 307, 322–23 (Tex.App.-Houston [1st Dist.] 2004, pet. denied); *see also Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994). "A factor that courts consider when determining usury is whether repayment was based on a contingency." *Catalina*, 881 S.W.2d at 297. This factor is important because it helps a court in determining whether a transaction was a loan or a business investment. *Id.; see also Bray v. McNeely*, 682 S.W.2d 615, 619 (Tex.App.-Houston [1st Dist.] 1984, no writ); *Beavers v. Taylor*, 434 S.W.2d 230, 231–32 (Tex.Civ.App.-Waco 1968, writ ref'd n.r.e.). If a transaction is missing any of the above identified three elements, it cannot be usurious. *See Holley*, 629 S.W.2d at 696–97. Thus, if the agreements did not constitute a loan, if the agreements did not create an absolute obligation to repay, or if the agreements did not charge "usurious interest," Anglo–Dutch's usury defense fails as a matter of law.

"'Loan' means an advance of money that is made to or on behalf of an obligor, the *principal amount* of which the obligor *has an obligation* to pay the creditor." Tex. Fin.Code Ann. § 301.002(a)(10) (Vernon Supp.2005) (emphasis added). "'Interest' means compensation for the use, forbearance, or detention of money." *Id.* § 301.002(a)(4). "'Usurious interest' means interest that exceeds the applicable maximum amount allowed by law." *Id.* § 301.002(a)(17). If there is no "loan," then any disputed amount charged cannot be characterized as interest, and without interest, there cannot be usury. *See First USA Mgmt., Inc. v. Esmond*, 960 S.W.2d 625, 628 (Tex.1997). "Usury statutes are penal in nature and should be strictly construed." *Tony's Tortilla Factory, Inc.*, 877 S.W.2d at 287; *Oyster Creek Fin. Corp.*, 176 S.W.3d at 323. "When construing a contract under a usury claim, courts presume the parties intended a nonusurious contract." *Fin. Sec. Servs., Inc. v. Phase I Elecs. of W. Tex., Inc.*, 998 S.W.2d 674, 677 (Tex.App.-Amarillo 1999, pet. denied).

Under the plain terms of the agreements, appellees' right to recover their principal and any return on their investment was contingent upon Anglo–Dutch's cash recovery, if any, in the Halliburton lawsuit. Per the unambiguous terms of the agreements, Anglo–Dutch did not have an absolute obligation to repay the principal amounts that appellees invested. In its arguments, Anglo–Dutch confuses the terms "contingency" and "risk." Appellees' belief that they were exposed to little or no risk does not negate the contingency in the agreements. Here, it is indisputable that, if Anglo–Dutch recovered nothing or an insufficient amount of damages, then according to the plain terms of the agreements, Anglo–Dutch had no obligation to reimburse appellees for the principal amounts invested, much less pay appellees

any return on their investments. Thus, as a matter of law, the agreements cannot be usurious. *Rinyu v. Teal,* 593 S.W.2d 759, 761 (Tex.Civ.App.-Houston [14th Dist.] 1979, writ ref'd n.r.e.) (finding sale of property with lease back provision and option to repurchase did not constitute usurious loan since grantee could not force grantor to exercise option, and there was no absolute obligation to repay); *Pansy Oil Co. v. Fed. Oil Co.,* 91 S.W.2d 453, 457 (Tex.Civ. App.-Texarkana 1936, writ ref'd) (stating that "repayment of any amount under said contract ... rested on the contingency, first, that the well to be drilled would produce oil; and, second, that it would produce enough oil to fulfill the contract" and finding that plaintiff's usury claims failed); *Korth v. Tumlinson,* 73 S.W.2d 1048, 1049 (Tex.Civ.App.-San Antonio 1934, no writ) (finding agreement to advance funds in exchange for promise to pay one-third of net proceeds upon sale of parcel of land not usurious because terms of contract did not show that principal would be absolutely repayable and instead showed that if land was not sold, lender would receive nothing); *cf. Johns v. Jaeb,* 518 S.W.2d 857, 859 (Tex.Civ.App.-Dallas 1974, no writ) (finding, as matter of law, that transaction was loan rather than contribution to limited partnership because there was absolute obligation to pay funds originally advanced to limited partnership and lender did not expose his "investment to the hazards of the business").

■ As Anglo–Dutch emphasizes, however, we must examine the form of the transaction and its substance in determining the existence or non-existence of usury. *Gonzales County Sav. & Loan Ass'n v. Freeman,* 534 S.W.2d 903, 906 (Tex. 1976). Thus, we recognize that whether an amount of money being charged constitutes interest depends not on what the parties call it, but on the substance of the

transaction. *First USA Mgmt., Inc.,* 960 S.W.2d at 627. For example, in *Tony's Tortilla Factory, Inc.,* the supreme court stated that a court "may look past the label of the fee to determine if a fee is a service charge or interest" and that, if there is a question of fact when there is a dispute in the evidence concerning the purpose of the fee, a jury may determine if the fee is "merely a device to conceal usury." 877 S.W.2d at 287. Additionally, other courts of appeals have stated that while "the document containing the allegedly usurious demand is the primary source from which to divine the drafter's intent," a party may offer extrinsic evidence to prove that a contract is usurious. *Strasburger Enters., Inc. v. TDGT Ltd. P'ship,* 110 S.W.3d 566, 574 (Tex.App.-Austin 2003, no pet.); *Hoxie Implement Co. v. Baker,* 65 S.W.3d 140, 146 (Tex.App.-Amarillo 2001, pet. denied); *see also Bray,* 682 S.W.2d at 617 (stating that "to determine whether this transaction should be classified as a loan or a sale, we must look to the intention of the parties as revealed by the contract and the surrounding circumstances")

■ However, the "extrinsic evidence" offered by Anglo–Dutch is not sufficient to create a fact issue concerning Anglo–Dutch's absolute obligation to repay appellees. Anglo–Dutch's "extrinsic evidence" consists almost entirely of the affidavit of Van Dyke, in which he testifies that both he and Anglo–Dutch considered the agreements to be loans. But, even as Anglo–Dutch recognizes, any particular "label placed upon the transaction by the parties should not control the determination of whether that transaction is a loan." *Najarro v. SASI Int'l Ltd.,* 904 F.2d 1002, 1007 (5th Cir.1990) (refusing to consider affidavit testimony that transaction was investment when terms of written contract between parties unambiguously constitut-

ed loan). Since we are permitted to look beyond labels contained in a parties' agreement, we are also permitted to look beyond labels contained in a party's affidavit. Anglo–Dutch's subjective intent concerning the nature of these agreements does not trump the language contained in the agreements themselves concerning the lack of an absolute obligation of Anglo–Dutch to repay appellees in the event that it did not obtain a cash recovery in the Halliburton lawsuit. *See Johns*, 518 S.W.2d at 860 (finding agreement to advance funds constituted usurious loan and noting that defendant's intent not to charge usury was immaterial "since the intent of the parties is presumed to be reflected in the documents which they signed").

■ Here, the agreements clearly set forth a contingency upon which appellees would be reimbursed, and Anglo–Dutch did not have an absolute obligation to repay appellees the monies they invested. Rather, Anglo–Dutch's obligation depended upon a contingency beyond appellees' control. The labels that Van Dyke attempted to assign to the terms of the agreements after the conclusion of the Halliburton lawsuit do not appear in the agreements themselves, but instead only appear in his affidavit testimony. We may not simply accept Van Dyke's labels concerning an absolute obligation to repay. Rather, we must instead focus on the substance of the transaction.

Van Dyke's testimony that he explained to appellees that there was "no risk" and that he was confident that Anglo–Dutch would "collect enough money" to repay appellees because Anglo–Dutch's interest in the oil and gas field lost as a result of Halliburton's and Ramco's actions was valued in the "hundreds of millions of dollars," is also insufficient to create a fact issue concerning Anglo–Dutch's usury de-

fense. These statements merely constituted Van Dyke's personal expectations on the success of the Halliburton lawsuit, and the fact that he communicated his personal expectations to appellees is of no consequence; Van Dyke's "confidence in the outcome of the lawsuit" did not dissolve the very real contingency that existed in the agreements themselves. Similarly, Van Dyke's testimony that appellees communicated to him that they did not consider their investments to be speculative, that some appellees stated that they believed that success in the Halliburton lawsuit was certain, that one appellee told Van Dyke that he could not afford to lose his money, and that multiple appellees stated that there must be "no risk whatsoever" because of Anglo–Dutch's trial counsel also constitute nothing more than appellees' personal expectations on the success of the Halliburton lawsuit. As such, it does not erase the contingency in the agreements. Significantly, despite Van Dyke's testimony concerning his and appellees' confidence in the outcome of the lawsuit, the very real contingency contained in the agreements is illustrated by the fact that the amount of the judgment that Anglo–Dutch ultimately received in the Halliburton lawsuit was significantly lower than what it had anticipated and, importantly, what it had represented to appellees that it would receive at the end of the case.

Here, there is no competent evidence showing that, by the time appellees invested, Anglo–Dutch had obtained "incontrovertible evidence" of its claims against Halliburton and Ramco, and that the evidence established damages in an amount sufficient to ensure the repayment of appellees' investment and sufficient to render the contingency in the agreements illusory. Although we do not have the record of the Halliburton lawsuit before us, there is nothing in the record of the instant case

that in any way negates the contingency in the agreements. *See Korth*, 73 S.W.2d at 1050 (stating that contract was not usurious "because it [did] not provide for the absolute repayment of the sums of money advanced" and it constituted "nothing more than a joint adventure in which both parties pool[ed] their resources with the hope of making a profit").

Moreover, we note that the testimony of Van Dyke upon which Anglo–Dutch relies to create a fact issue consists almost entirely of unsubstantiated legal and factual conclusions and is not competent summary judgment evidence. *See Rizkallah v. Conner*, 952 S.W.2d 580, 587 (Tex.App.-Houston [1st Dist.] 1997, no writ).[7] For example, Van Dyke testified that Anglo–Dutch's counsel obtained evidence that "conclusively established that the confidentiality agreements had been breached" and that Halliburton's and Ramco's own documents "effectively established" damages. Van Dyke further testified "that there was no risk to [appellees'] principal" because it was "established" that Halliburton and Ramco breached their confidentiality

agreements and that Halliburton's economic model "established" that Anglo–Dutch's interest in the oil and gas field was valued in the hundreds of millions of dollars. Van Dyke's legal conclusions, unsupported by any record evidence, and factual conclusions, also unsupported by record evidence and largely based on his subjective beliefs, do not create a fact issue. Also, although the lawyers retained by Anglo–Dutch in the Halliburton lawsuit may have been competent and skilled, this fact is insufficient to support Van Dyke's conclusion that recovery was certain. In sum, Van Dyke's testimony did not create a fact issue as to whether Anglo–Dutch had an absolute obligation to repay or that the contingency in the agreements was illusory[8] and, thus, was insufficient to defeat summary judgment.

██ We must also reject Anglo–Dutch's argument that, even if there originally was a "real contingency" and a serious risk that Anglo–Dutch might lose the lawsuit, once it settled with Halliburton, it had an absolute obligation to repay appel-

---

7. Van Dyke's testimony, consisting merely of legal and factual conclusions, unsupported by evidence and based in large part on subjective opinion, is substantively defective. *Rizkallah v. Conner*, 952 S.W.2d 580, 587 (Tex.App.-Houston [1st Dist.] 1997, no writ).

8. Anglo–Dutch argues that "an illusory contingency will not remove a transaction from the scope of the usury laws—at least not as a matter of law." Anglo–Dutch cites the following illustration offered by the Restatement (First) of Contracts: "A borrows from B $5000, payable in three years, secured by a mortgage. The contract for the loan provides that if the debtor dies from tuberculosis before the note is due, the debt shall be cancelled. The rate of interest provided for is largely in excess of that permitted by the local usury law. A does not have tuberculosis at the time of the loan and there is no probability that he will acquire the disease. The provision is inserted as a device to evade the usury

law. The loan is usurious." RESTATEMENT (FIRST) OF CONTRACTS § 527 illus. 4 (1932). Although a loan is not rendered non-usurious simply by the inclusion of an illusory contingency, the evidence in the record does not show that the contingency here was illusory, nor does the evidence even raise an issue of fact that the contingency was illusory. Anglo–Dutch suggests that, based on Van Dyke's testimony concerning the subjective belief of the parties, we should ignore the contingency of the agreement. However, this would render any successful business venture subject to a claim of usury when, despite the terms of an investment agreement that places an investment fully at risk, a borrower alleges, once the business venture proves to be a success, that the investment agreement is actually a loan and should be voided on grounds of usury. This would leave investors who advanced funds based on *promised returns* and who were subject to all the financial risk without the benefit of their bargain.

lees and then the agreements became usurious. The fact that Anglo–Dutch did receive a cash recovery in its settlement with Halliburton and the fact that the recovery was sufficient to enable it to repay appellees their principal and their total returns does not make the agreements usurious. *See Bray,* 682 S.W.2d at 619 (finding agreement with option to purchase did not obligate party to make payment until option was exercised and, thus, "there was only a contingent obligation at the time the contract was formed"; further stating that "the fact that Bray did exercise the option does not make a contract a usurious loan as a matter of law"); *Beavers,* 434 S.W.2d at 231–32 (holding that fact that contingent payments exceeded lawful interest rate did not render a contract usurious as matter of law).

Noting that no other Texas court has addressed usury allegations in the context of litigation funding agreements, the parties cite a number of cases from other jurisdictions that have addressed the enforceability of such agreements. Anglo–Dutch cites *Echeverria v. Estate of Lindner,* 7 Misc.3d 1019(A), 801 N.Y.S.2d 233 (N.Y.Sup.Ct.2005), *Lawsuit Financial, L.L.C. v. Curry,* 261 Mich.App. 579, 683 N.W.2d 233 (2004), and *Rancman v. Interim Settlement Funding Corp.,* No. 20523, 2001 WL 1339487, at *3 (Ohio Ct.App. Oct. 31, 2001) (not designated for publication). Although we note that usury laws vary greatly from state to state, as do the policies on which usury laws are adopted, we consider these cases because this specific issue is one of first impression in Texas.

In *Echeverria,* the New York Superior Court held that a litigation funding agreement that provided for a lender's right of recovery only in the event the plaintiff received a judgment in his favor charged usurious interest. 801 N.Y.S.2d 233. However, the court noted that because the underlying case was a strict liability labor law case "there was a very low probability that judgment would not be in favor of the plaintiff" and, in fact, later characterized the probable success of the lawsuit a "sure thing." *Id.* Similarly, in *Rancman,* the Ohio Court of Appeals concluded that a litigation funding agreement charged a usurious amount of interest after finding that evidence presented at trial demonstrated that "no real probability existed that non-payment would occur."[9] 2001 WL 1339487, at *3. Unlike the courts' characterizations of the underlying lawsuits in *Echeverria* and *Rancman,* based on the summary judgment record, we cannot, for the reasons discussed above, characterize the outcome of the Halliburton lawsuit at the time the appellees signed the investment agreements as a "sure thing," and we cannot accept Anglo–Dutch's position that Van Dyke's testimony created a fact issue concerning its usury defense. Rather, unlike the evidence presented in *Rancman,* the summary judgment evidence presented in this case establishes the existence of a contingency and the lack of an absolute obligation to repay.

The final case cited by Anglo–Dutch, from the Michigan Court of Appeals, is substantively distinguishable. In *Curry,* the parties entered into a litigation funding agreement after the jury rendered a verdict in the amount of $27 million. 683

9. The Ohio Supreme Court affirmed the opinion of the court of appeals on the grounds that the advances made to the plaintiff constituted champerty and maintenance, and thus the contracts requiring repayment of the advances were void and unenforceable. *Rancman v. Interim Settlement Funding Corp.,* 99 Ohio St.3d 121, 789 N.E.2d 217, 221 (2003). The court did not address the court of appeals' holding that the contracts constituted loans rather than investments.

N.W.2d at 239. While the trial court in *Curry* still had to resolve a motion for remittitur and the issue of whether exemplary damages could be awarded, liability had been established by the time the litigation funding agreement was executed. *Id.* The court noted that, contrary to the terms of the non-recourse agreements, at the time the advances were made, the plaintiff had an "absolute right to repayment" because the parties entered into the agreements "long after the defendants in the underlying personal injury lawsuit admitted liability and after the jury returned a verdict of $27 million in damages." *Id.* at 240. Thus, the court concluded the agreements were usurious. *Id.* Here, there is no evidence that Halliburton had entered a stipulation of liability, there had not yet been a trial, there had not yet been a finding of liability, and there had not been a damage award.

The reasoning applied by the foreign courts in the cases cited by appellees is applicable here and is more persuasive. *See Dopp v. Yari,* 927 F.Supp. 814, 822–24 (D.N.J.1996); *Kraft v. Mason,* 668 So.2d 679, 684 (Fla.Dist.Ct.App.1996); *Nyquist v. Nyquist,* 255 Mont. 149, 841 P.2d 515, 518 (1992); and *Aldrich v. Aldrich,* 260 Ill.App. 333, 1931 WL 1668, at *12–13 (Ill. App.Ct.1931). For example, in *Dopp,* the District Court of New Jersey enforced a litigation funding agreement and rejected a claim that the agreement was usurious. 927 F.Supp. at 823. The court, noting that the agreement contemplated a degree of risk to the investor, held that the agreement was a "joint undertaking of the parties disclosing an intent to distribute proceeds of the case, if any." *Id.* Similarly, in *Kraft,* the Florida District Court of Appeal enforced an agreement loaning money to a plaintiff in exchange for a share of any judgment on the grounds that "when the

loan was given, any talk of recovery was pure speculation." 668 So.2d at 684; *see also Nyquist,* 841 P.2d at 518 (holding agreement to advance litigation expenses did not constitute loan agreement subject to usury statute because agreement contained conditional obligation; further stating "no certainty ever existed that the plaintiffs in the litigation would prevail and receive a damage award"). Similarly, here, the agreements contained a conditional obligation and, despite Van Dyke's testimony concerning his subjective belief, there was no certainty that Anglo–Dutch would recover an amount sufficient to repay appellees their principal and returns.

We overrule Anglo–Dutch's first issue.

### Unregistered Securities

■ In its second issue, Anglo–Dutch contends that the trial court erred in granting summary judgment in favor of appellees because the evidence raises a genuine issue of material fact as to whether the agreements were illegal, unregistered securities and thus, void and unenforceable under both state and federal law. Specifically, Anglo–Dutch argues that the evidence raises fact issues as to whether "(1) the litigation funding agreements fall within article 33(K) [of the Texas Securities Act],[10] and (2) whether appellees are in pari delicto and therefore barred from enforcing the agreements." In support of its in pari delicto defense, Anglo–Dutch asserts that the evidence shows that "some, if not all, of the appellees shared equal responsibility for the agreements and occupied a position akin more to that of a promoter than an investor." However, the only evidence Anglo–Dutch cites in support of this assertion is that one of the appellees, Law Funds, "exists entirely for the purpose of financing lawsuits." An-

---

10. Tex.Rev.Civ. Stat. Ann. art. 581–33(K) (Vernon Supp.2005).

glo–Dutch concludes that Law Funds "would have much greater knowledge of the laws governing the type of agreements that represent its principal business." As to the other appellees, Anglo–Dutch asserts that Haskell, Sheriff, and O'Sullivan are sophisticated investors and Scully and McCord "own oil and gas businesses." This evidence, Anglo–Dutch concludes, is "sufficient to at least raise a fact issue" as to whether the agreements are illegal, unregistered securities.

Appellees argue that, even assuming the agreements can be characterized as securities under the Securities Act of 1933[11] and the Texas Securities Act, the agreements are not void and unenforceable.[12] Appellees stress that the securities laws exist to protect purchasers, not sellers, and that any failure by Anglo–Dutch to register the securities provided appellees, not Anglo–Dutch, the right to rescind the agreements.

Article 581–33(K) of the Texas Securities Act states:

> No person who has made or engaged in the performance of any contract in violation of any provision of this Act or any rule or order or requirement hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any suit on the contract.

TEX.REV.CIV. STAT. ANN. art. 581–33(K) (Vernon Supp.2005).

Here, Anglo–Dutch has not presented any evidence raising a genuine issue of material fact that appellees acquired their rights under the agreements "with knowledge of the facts by reason of which its making or performance was in violation" of the Act. Furthermore, Anglo–Dutch has not cited any authority for the proposition that, as the seller of the "unregistered securities," it has the right to void the agreements. To the contrary, federal and state authority indicate that the agreements are not automatically void, but instead are voidable by the purchaser. In *A.C. Frost & Co. v. Coeur D'Alene Mines Corp.*, 312 U.S. 38, 40–41, 61 S.Ct. 414, 415–16, 85 L.Ed. 500 (1941), the Supreme Court stated "[t]he essential purpose of the [Securities Act of 1933] is to protect investors by requiring publication of certain information concerning securities before offered for sale" and that "[n]o provision of the Act declares that in the absence of registration, contracts in contemplation of or having relation to a public offering shall be void."[13] The Court noted that "the clear legislative purpose was protection of innocent purchasers of securities" and that such purchasers were "given definite remedies inconsistent with the idea that every contract having relation to sales of unregistered shares is absolutely void." *Id.*, 312 U.S. at 43, 61 S.Ct. at 417. Simi-

---

**11.** 15 U.S.C.S. § 77a (1991).

**12.** In the trial court, appellees argued that, for purposes of their summary judgment motion, the trial court could consider the agreements as securities but that the agreements were not void and unenforceable. On appeal, appellees note many reasons why the agreements may not be "unregistered securities," but concede that, in our review of the trial court's order granting summary judgment, we may consider the agreements as securities and evaluate whether the defenses asserted by

Anglo–Dutch apply to defeat the summary judgment. Thus, we do not reach the issue of whether the agreements constitute securities.

**13.** When Texas securities laws and federal securities laws contain similar language, Texas courts look to federal cases interpreting the federal securities laws when interpreting similarly worded state securities laws. *Summers v. WellTech, Inc.*, 935 S.W.2d 228, 232–33 (Tex.App.-Houston [1st Dist.] 1996, no writ).

larly, in *Smith v. Fishback,* 123 S.W.2d 771, 780 (Tex.Civ.App.-Texarkana 1938, writ ref'd), the Texarkana Court of Appeals, in considering the Texas Securities Act, held that a promoter's failure to comply with the securities act did not render the royalty contracts being promoted automatically void, but instead made them voidable and subject to being set aside by purchasers. Accordingly, we hold that Anglo–Dutch has failed to present any evidence sufficient to raise a fact issue concerning its contention that the agreements are void and unenforceable under the Texas Securities Act because they were not properly registered.

 Similarly, Anglo–Dutch has not presented any evidence raising a genuine issue of material fact concerning its in pari delicto defense. Pursuant to the doctrine of in pari delicto, "a buyer may not enforce a transaction if (1) the buyer bore at least substantially equal responsibility for the violations he sought to redress, (2) preclusion of recovery would not significantly interfere with enforcement of the securities laws and protection of investors, and (3) the role of the plaintiff in the transaction was more that of a promoter than investor." *Pinter v. Dahl,* 486 U.S. 622, 633–39, 108 S.Ct. 2063, 2071–74, 100 L.Ed.2d 658 (1988). Here, the evidence showed that Anglo–Dutch actively solicited appellees' investments. Van Dyke testified that he had conversations with each appellee regarding the proposed transactions, that he made a presentation to each of the appellees regarding the transactions, and that he presented appellees with the Claims Investment Agreements, which were executed by the parties and which governed the parties' investment relationships. Anglo–Dutch did not present any

evidence that the role of appellees in the transaction was more that of a promoter than investor, and thus Anglo–Dutch's in pari delicto defense fails as a matter of law.

We overrule Anglo–Dutch's second issue.

## Public Policy

In its third issue, Anglo–Dutch contends that the trial court erred in granting summary judgment in favor of appellees because the agreements violated Texas public policy. Anglo–Dutch asserts that the agreements are "champertous [14] in nature," "prey on financially desperate plaintiffs," "give third parties control over litigation in which those parties have no interests at stake," and "prolong litigation by inhibiting plaintiffs from settling lawsuits." Anglo–Dutch further contends that public policy prohibits an agreement, like the litigation funding agreements here, in which a third party promises to pay money to a plaintiff "in a pending lawsuit in exchange for a cash payment or an interest rate that, if the agreement were a loan, would exceed the maximum allowable interest rate under Texas law." Anglo–Dutch notes that appellees did not acquire a percentage interest in its recovery in the Halliburton lawsuit and instead received a substantial rate of interest on formulas that were not directly tied to the amount of its recovery. In response, appellees argue that Texas law authorizes and protects the assignment of interests in pending lawsuits and that the agreements are valid and enforceable under the laws and public policy of Texas.

In *State Farm Fire & Casualty Co. v. Gandy,* 925 S.W.2d 696, 707 (Tex.1996),

---

14. "Champerty" is defined as "[a]n agreement between a stranger to a lawsuit and a litigant by which the stranger pursues the litigant's claim as consideration for receiving part of any judgment proceeds." BLACK'S LAW DICTIONARY 224 (7th ed.1999).

the Texas Supreme Court stated that "[p]racticalities of the modern world have made free alienation of choses in action the general rule, but they have not entirely dispelled the common law's reservations to alienability, or displaced the role of equity or policy in shaping the rule." The court also recognized "the general rule is that a contractual assignment may be 'inoperative on grounds of public policy.'" *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS § 317(2)(b) (1981)).[15]

■ Assignments of causes of action that tend to increase and distort litigation may be found to violate public policy. *Gandy,* 925 S.W.2d at 707–11 (citing *Elbaor v. Smith,* 845 S.W.2d 240, 250 (Tex. 1992) (holding Mary Carter agreements are void as against public policy); *Int'l Proteins Corp. v. Ralston–Purina Co.,* 744 S.W.2d 932, 934 (Tex.1988) (holding tortfeasor cannot take assignment of plaintiff's claim as part of settlement agreement with plaintiff and prosecute that claim against joint tortfeasor); *Trevino v. Turcotte,* 564 S.W.2d 682, 690 (Tex.1978) (holding assignment of interests in estate invalid); *Zuniga v. Groce, Locke & Hebdon,* 878 S.W.2d 313, 316 (Tex.App.-San Antonio 1994, writ ref'd) (holding assignments of legal malpractice claims invalid)). With these concerns in mind, we address the specific complaints asserted by Anglo–Dutch.

■ First, we note that Anglo–Dutch has not cited us to any authority that agreements that are "champertous in nature" are automatically void or against public policy. *See Gandy,* 925 S.W.2d at 707. Second, Anglo–Dutch has not presented a compelling argument of how these agreements prey on financially desperate plaintiffs. Instead, at least in this case, it was Anglo–Dutch who solicited appellees' investments after being unable to obtain a conventional loan because it had inadequate collateral. Here, the amount of returns provided to each appellee and the formulas upon which the returns were based varied significantly from agreement to agreement, suggesting that the amount of the returns was bargained for by the parties. Moreover, if Anglo–Dutch was financially desperate, as it alleges, it would have been unable to prosecute the Halliburton lawsuit without the appellees' funding since, as Anglo–Dutch concedes, it could not obtain a conventional loan from a commercial bank. Even Van Dyke testified that the funds advanced by appellees were necessary, in part, so that Anglo–Dutch could continue to operate its business and avoid bankruptcy.

Third, there is no evidence that appellees maintained any control over the Halliburton lawsuit. The agreements do not contain provisions permitting appellees to select counsel, direct trial strategy, or participate in settlement discussions, nor do they permit appellees to look to Anglo–Dutch's trial counsel directly for payment. Thus, the cases cited and the public policy arguments made by Anglo–Dutch are not pertinent to the agreements at issue in this lawsuit.

Fourth, it is not readily apparent that these types of agreements necessarily increase or prolong litigation. It is doubtful that litigation funding agreements, like the ones presented here, in which the investor has no right to repayment unless the plaintiff receives a recovery, serve to increase litigation. Presumably, prior to making an investment pursuant to a similarly structured agreement, an investor would consider the merits of the suit and make a

---

15. We also note that the Property Code provides that "[a] judgment or part of a judgment of a court of record or an interest in a cause of action ... is assignable in law or equity, if the transfer is in writing." TEX. PROP.CODE ANN. § 12.014(a) (Vernon 2004).

calculated risk assessment on the probability of a return on its investment. An investor would be unlikely to invest funds in a frivolous lawsuit, when its only chance of recovery is contingent upon the success of the lawsuit. Finally, in regard to Anglo–Dutch's argument that the agreements serve to prolong litigation, it appears here, because of the increasing returns to which appellees were entitled, the manner in which the agreements were structured may actually have encouraged settlement. Accordingly, we hold that the agreements do not violate Texas public policy.

We overrule Anglo–Dutch's third issue.

## Attorneys' Fees

Having overruled Anglo–Dutch's first three issues, we necessarily overrule its fourth issue, in which it contends that the trial court erred in awarding appellees attorneys' fees because appellees were not entitled to summary judgment.

## Conclusion

We affirm the judgment of the trial court.