Opinion issued August 9, 2007





 













In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00960-CV

__________


CASE FUNDING NETWORK, L.P., 3K PARTNERSHIP, PROSPERITY
SETTLEMENT FUNDING, INC., LAWSUIT FINANCIAL, LLC, FUTURE
SETTLEMENT FUNDING OF SC, INC., NEW AMSTERDAM CAPITAL
PARTNERS, INC., ROBERT M. PRESS, RYAN BROOKS, JOSEPH
DINARDO, JOSEPH GIURINTANO, PLAINTIFF SUPPORT SERVICES,
INC., ROBERT E. HILL, AND ANZAR SETTLEMENT FUNDING CORP.,
Appellants


V.


ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC.,
ANGLO-DUTCH (TENGE) LLC, AND SCOTT VAN DYKE, Appellees






On Appeal from the 127th District Court

Harris County, Texas

Trial Court Cause No. 2004-23845






O P I N I O N

 Appellants, Case Funding Network, L.P. ("Case Funding"), 3K Partnership
("3K"), Prosperity Settlement Funding, Inc. ("Prosperity"), Lawsuit Financial, LLC
("Lawsuit Financial"), Future Settlement Funding of SC, Inc. ("Future Settlement"),
New Amsterdam Capital Partners, Inc. ("New Amsterdam"), Robert M. Press, Ryan
Brooks, Joseph DiNardo, Joseph Giurintano, Plaintiff Support Services, Inc.
("Plaintiff Support"), Robert E. Hill, and Anzar Settlement Funding Corp. ("Anzar")
(collectively, "the investors"), challenge the trial court's rendition of summary
judgment (1) in favor of appellees, Anglo-Dutch Petroleum International, Inc., Anglo-Dutch (Tenge) LLC, and Scott Van Dyke (collectively, "Anglo-Dutch"), in the
investors' suit against Anglo-Dutch for breach of contract, fraud, fraudulent
inducement, conversion, breach of fiduciary duty, and violation of section 32.45 of
the Texas Penal Code (2) arising out of multiple litigation funding agreements (the
"investment agreements"). 

 In their first issue, the investors contend that the trial court erred in granting
Anglo-Dutch's no-evidence summary judgment motions on the investors' claims for
fraud, fraudulent inducement, conversion, breach of fiduciary duty, and violation of
section 32.45 of the Texas Penal Code. In their second and third issues, the investors
contend that the trial court erred in granting summary judgment in Anglo-Dutch's
favor on the ground of accord and satisfaction as to the breach of contract claims
brought by investors Case Funding, 3K, Lawsuit Financial, Future Settlement, New
Amsterdam, Brooks, DiNardo, Giurintano, Plaintiff Support, and Hill (the "accord
investors") and on the ground of release as to the breach of contract claims brought
by Press, Anzar, and Prosperity (the "release investors"). In their fourth and fifth
issues, the investors contend that the trial court erred in not applying the doctrine of
collateral estoppel as to the investors' tort and statutory claims and as to Anglo-Dutch's affirmative defenses of accord and satisfaction and release "given that
[Anglo-Dutch] litigated and lost identical factual issues in a [separate] bench trial
before Judge [Lamar] McCorkle involving another investor." (3) In their sixth issue, the
investors contend that the trial court erred in granting summary judgment in favor of
Van Dyke as to all of the investors' claims. 

 In a "conditional" cross-appeal, (4) Anglo-Dutch contends in its first, second, and
third cross-issues, subject to the trial court's rendition of summary judgment in
Anglo-Dutch's favor on its affirmative defenses, that the trial court erred in
concluding that the investment agreements were enforceable and valid and that they
did not violate public policy, were not usurious loans, were not unregistered
securities, and that the investors were not acting "in pari delicto." In its fourth cross-issue, Anglo-Dutch contends that the trial court erred in concluding that "collateral
estoppel barred [Anglo-Dutch's] defenses of usury, securities violations, and Texas
public policy." 

 We affirm. 

Factual and Procedural Background


 Anglo-Dutch engages in the oil and gas exploration business. Van Dyke is the
president of Anglo-Dutch Petroleum International, Inc. In 2000, Anglo-Dutch filed
suit against "Halliburton" and "Ramco" (the "Halliburton lawsuit"), (5) seeking to
recover over $600 million in damages for breach of contract and misappropriation of
trade secrets arising out of the parties' development of an oil and gas field in
Kazakhstan.

 Due to the expenses associated with prosecuting the Halliburton lawsuit, and
in order "to meet its operating expenses" and "avoid bankruptcy," Anglo-Dutch
needed to raise money. Anglo-Dutch initially, but unsuccessfully, sought to borrow
money from commercial banks, using the Halliburton lawsuit as collateral. The
investors allege in their petition that after Anglo-Dutch was unable to obtain
financing from traditional sources, Van Dyke solicited them to enter into Claims
Investment Agreements (the "investment agreements"), "which required [Anglo-Dutch] to pay [the investors] a certain sum of money from any cash recovery in the
suit against Halliburton." (6) 

 The summary judgment evidence establishes that, pursuant to the terms of the
investment agreements, the investors collectively invested a total of over $700,000. 
The investment agreements defined the terms of the parties' relationships and set
forth formulas for calculating any returns that the investors would be entitled to
receive in the event that Anglo-Dutch obtained a cash recovery. (7) The agreements
generally provided that Anglo-Dutch was "selling interests in any Cash Recovery . . .
that it may receive from the [Halliburton] lawsuit." The agreements also generally
stated, 

Payments by Anglo-Dutch to Investor. If and only if, a final disposition
or settlement of the Lawsuit results in a Cash Recovery to Anglo-Dutch,
Anglo-Dutch shall pay (or cause to be paid) to Investor the sum total of:


 (a) its Investment, plus,


 (b) an amount equal to its Investment, plus


 (c) a return on its Investment (hereinafter referred to as the
"Investor's Return") . . . .


. . . .


If a final disposition or settlement of the Lawsuit fails to result (for
whatever reason) in a Cash Recovery, then Anglo-Dutch shall have no
obligation to make any payment to Investor for any portion of the
Investor's Total Return. If the Cash Recovery received by Anglo-Dutch
is insufficient to pay all of the Investor's Total Return, Anglo-Dutch
shall pay (or cause to be paid) to Investor from the Cash Recovery, only
the portion of Investor's Total Return as is possible by applying all of
Anglo-Dutch's portion of the Cash Recovery in accordance with the
Order of Payments Schedule . . . after which Anglo-Dutch shall have no
further liability or obligation to Investor for any portion of its Investor's
Total Return remaining unpaid.


. . . .


Order of Payments Schedule. . . . It is further understood that Investor
shall have no claim or right to any portion of the Cash Recovery due or
payable to any attorneys retained at any time by Anglo-Dutch. 


 . . . . 

Time of Payment. If and when a final disposition or settlement of the
Lawsuit results in a Cash Recovery, Anglo-Dutch shall pay (or cause to
be paid) to Investor all (or the proportionate share, as the case may be)
of its Investor's Total Return in accordance with the Order of Payments
Schedule within ten (10) days following Anglo-Dutch's receipt of such
Cash Recovery. If such Cash Recovery is received by Anglo-Dutch in
installments over time, then Anglo-Dutch (if necessary, because the
amounts of such installments are insufficient to pay all the Investor's
Total Returns) shall pay Investor its respective Investor's Total Returns
in installments (over the same period of time) in accordance with the
Order of Payments Schedule, until such time as the Investor's Total
Returns (or its proportionate share thereof) shall have been paid in full.


 The investment agreements further stated that in the event of Anglo-Dutch's
bankruptcy, the investor's interest in any cash recovery would not be described as a
debt or obligation of Anglo-Dutch. The agreements granted the investors "a security
interest in the amount of the Investor's Total Return Against Anglo-Dutch's portion
of any Cash Recovery," and an "Assignment of Cash Recovery," which was attached
to the agreements, stated that "Anglo-Dutch hereby assigns, transfers, and sets over
to Investor its proportionate share of Anglo-Dutch's right, title and interest in and to
any Cash Recovery . . . actually received by Anglo-Dutch from the [Halliburton]
Lawsuit . . . as continuing and collateral security for the payment of obligation due
and owing by Anglo-Dutch to Investor." The investors assert that the assignments
and security interests made them "property owners with respect to portions of any
Cash Recovery under the agreements." 

 After the Halliburton lawsuit was tried to a jury, the trial court entered a
judgment in the amount of approximately $81 million, including $10 million in
attorneys' fees, against Halliburton and Ramco. Van Dyke explained in his affidavit
that, at this point, "[t]o make it economically worthwhile for Anglo-Dutch to settle
the [Halliburton] Lawsuit" and "[i]n order for Anglo-Dutch to remain in business,"
Anglo-Dutch needed a "number" of the investors to agree to take less money than
specified in the investment agreements. "In other words, for Anglo-Dutch to settle
and take less than the judgment amount, some or all of its [investors] needed to do the
same." Thus, Van Dyke called "a majority of the lenders and requested they accept
less money." 

 On or about April 12, 2004, Van Dyke, on behalf of Anglo-Dutch, sent a letter
to each of the investors. In these letters, Anglo-Dutch noted that, subsequent to the
entry of the final judgment in the Halliburton lawsuit, the Texas Supreme Court
issued an opinion "impact[ing] Anglo-Dutch's position with respect to the appeals
process and the settlement of the lawsuit" and that the trial court entered an amended
final judgment "significantly reducing" the value of its judgment. Anglo-Dutch then
stated that "[i]n light of current Texas law, it is Anglo-Dutch's strong desire to settle
the case at this time, but for a significantly lower amount than we ever expected." 
Thus, in order to "achieve a resolution" of the Halliburton lawsuit, Anglo-Dutch
"request[ed] everyone who entered into a Claims Investment Agreement to accept a
lower payment" than prescribed by the investment agreements. Anglo-Dutch set forth
proposed payment terms, a specific payout amount (characterized as a "return on
investment"), and an annual percentage rate based "on terms being given to
everyone." Anglo-Dutch attached proposed settlement and release agreements to the
letters. The April 12, 2004 letters also generally represented that "[m]any of the
parties who entered into Claims Investment Agreements have executed their
respective Settlement and Releases and returned them to us." The settlement and
release agreements provided,

 To induce Anglo-Dutch to accept settlement terms substantially
less than Anglo-Dutch had anticipated to receive and/or to help facilitate
an early payment between Anglo-Dutch and the defendants in the
[Halliburton lawsuit] . . . Investor agrees to accept a lower payment from
Anglo-Dutch than what is provided for in the Investment Agreements 
. . . All Investment Agreements shall terminate, and, by receiving such
money, Investor releases Anglo-Dutch from any and all obligations with
respect to the Investment Agreements. 


 The settlement and release agreements further recited that the agreements were
being made "for good and valuable consideration, the sufficiency of which is hereby 
acknowledged by both parties" and set forth a date certain by which Anglo-Dutch
would make the payments. Only the three release investors--Press, Anzar, and
Prosperity--executed the settlement and release agreements. The remaining investors
in the instant case rejected Anglo-Dutch's April 12, 2004 settlement request.

 On April 16, 2004, Anglo-Dutch and Halliburton entered into a settlement
agreement. Although the terms of the Halliburton settlement are undisclosed, the
record suggests that the amount of the Halliburton settlement would have been
sufficient to pay all of the remaining investors the amounts to which they were
entitled under the investment agreements. Anglo-Dutch has not taken the position,
at trial or on appeal, that the Halliburton settlement was insufficient to satisfy the
amounts owed to the investors pursuant to the provisions of the investment
agreements. Regardless of the actual amount of the Halliburton settlement, Van Dyke
testified that, around the time of the settlement, he "consulted a lawyer to help in
negotiations" with the remaining investors. "[F]ollowing several consultations with
the attorney," he "concluded in the first half of April 2004 that the [investment
agreements] violated Texas public policy, . . . were unenforceable, and were
otherwise invalid." Thus, on April 23, 2004, Anglo-Dutch sent the remaining
investors letters, which were drafted by Anglo-Dutch's counsel, disputing the validity
of the investment agreements. In these letters, Anglo-Dutch stated,

 On Friday, April 16, 2004, Anglo-Dutch settled with Halliburton
with regard to the Lawsuit. In connection with the Lawsuit and the
Agreement, enclosed please find a check in the amount of . . . . 

 As we communicated to you . . . , in light of current Texas law, it
was Anglo-Dutch's strong desire to settle the Lawsuit with Halliburton. 
To achieve a resolution of the Lawsuit with Halliburton, Anglo-Dutch
requested that you accept a lower payment than what is set forth in the
Agreement. Notwithstanding recent developments in Texas law and
Anglo-Dutch's desire to settle the Halliburton lawsuit, you informed me
that you were unwilling to accept a lower payment and that you
preferred that the Lawsuit be continued instead of accepting a lower
payment.


 Your actions put at risk Anglo-Dutch's ability to resolve the
Lawsuit with Halliburton. As such, without waiving any rights or claims
it may have, Anglo-Dutch asserts that the Agreement is contrary to
Texas public policy and is unenforceable under Texas law, and
otherwise disputes its validity.


(emphasis added). Anglo-Dutch further stated in its April 23, 2004 letters, 

 Notwithstanding Anglo-Dutch's contention, and any rights it may
have under Texas law, in an effort to compromise any dispute between
Anglo-Dutch and you, Anglo-Dutch has tendered the enclosed check to
you. The check is less than the amount called for under the Agreement.


 By depositing the enclosed check, you hereby expressly release
Anglo-Dutch from any and all present and future liability relative
to the Agreement and the Lawsuit.


 By depositing the check, you also hereby acknowledge that an
"accord and satisfaction" and a "novation" have occurred. Anglo-Dutch will be discharged of all liability under the Agreement (of
whatever nature), and you may not interpret this fact in any contrary
manner whatsoever. Anglo-Dutch shall have no further obligation under
the Agreement to you, either in law or in equity.


 Tender of the enclosed check by Anglo-Dutch, and acceptance
by you, constitutes full satisfaction of any claim you may have under
the Agreement or under Texas law. By obtaining payment of the
check, you are hereby agreeing to a settlement of the dispute (and the
Agreement) for the amount tendered.


 This letter, and the restrictive language on the endorsement,
constitutes an unmistakable communication to you that the tender of the
lesser sum is upon the condition that your acceptance of the enclosed
check will constitute satisfaction of Anglo-Dutch's obligation under the
Agreement.


 . . . . 


 This letter, and the enclosed check, are being tendered for
settlement purposes only.


(emphasis added in first paragraph). Anglo-Dutch wrote on the front of the checks, 

 PURSUANT TO TEXAS LAW INCLUDING BUT NOT
LIMITED TO U.C.C. § 3.311, PAYMENT IS TENDERED IN FULL
AND FINAL SATISFACTION OF ALL AMOUNTS DUE AND
CLAIMS OR RIGHTS ARISING UNDER THAT CERTAIN CLAIMS
INVESTMENT AGREEMENT . . . BY AND BETWEEN [ANGLO-DUTCH] AND PAYEE. BY ENDORSING, NEGOTIATING,
DEPOSITING, AND/OR PLEDGING THIS CHECK, PAYEE
RELEASES AND DISCHARGES ANGLO-DUTCH, ITS OFFICERS,
DIRECTORS, SHAREHOLDERS, MEMBERS, AND EMPLOYEES,
AND SCOTT VAN DYKE, INDIVIDUALLY, FROM ANY AND ALL
CLAIMS RELATED TO THE AGREEMENT. 


 Anglo-Dutch wrote on the back of the checks, "PAYEE ACCEPTS AMOUNT
TENDERED IN FULL SATISFACTION OF ALL AMOUNTS DUE AND CLAIMS
ARISING UNDER THE AGREEMENT, AND AGREES THAT PAYMENT
CONSTITUTES A NOVATION AND/OR WAS OBTAINED IN ACCORD AND
SATISFACTION." 

 All of the remaining investors (the accord investors) in the instant case signed
and deposited the enclosed settlement checks. However, after receiving and
accepting their settlement checks, both the release investors and the accord investors
filed the instant suit. In support of their breach of contract claims, the investors
alleged that Anglo-Dutch failed to pay them as required by the investment
agreements. In support of their fraud claims, the investors alleged that after settling
with Halliburton, Anglo-Dutch sent them letters claiming "for the first time" that the
investment agreements were against public policy, void, and unenforceable and that
the transactions were loans. The investors asserted that since Anglo-Dutch had
always represented that the investment agreements were valid investments, Anglo-Dutch fraudulently induced them to enter into the investment agreements. The
investors further asserted that after Anglo-Dutch's settlement with Halliburton,
Anglo-Dutch represented that "many, most, or all of the other investors had agreed
to take discounts off the total amount owed . . . and/or had already signed settlement
agreements and releases with [Anglo-Dutch]. In support of their penal code and
breach of fiduciary duty claims, the investors alleged that Anglo-Dutch was acting
in a fiduciary capacity and breached its duties to "safeguard the monies" owed to the
investors by disbursing the Halliburton settlement funds without paying them the
amounts owed. In support of their conversion claims, the investors alleged that
Anglo-Dutch converted the investors' proportionate share of the cash recovery. 

 The investors and Anglo-Dutch filed multiple summary judgment motions. 
The investors filed summary judgment motions on their contract claims, and Anglo-Dutch filed summary judgment motions on the grounds that the investors' claims
were barred by the affirmative defenses of release and accord and satisfaction. 
Anglo-Dutch also filed no-evidence summary judgment motions on the investors' tort
and statutory claims. 

 The trial court granted the investors' summary judgment motions "to recover
on the contracts" subject to Anglo-Dutch's affirmative defenses. The trial court
denied Anglo-Dutch's summary judgment motions "on grounds related to the contract
issues," i.e., on grounds that the investment agreements violated Texas public policy,
were usurious loans, and were unregistered securities. However, the trial court
granted Anglo-Dutch summary judgment on the grounds of accord and satisfaction
and release, specifically stating that Anglo-Dutch "established as a matter of law that
there was an accord and satisfaction of the underlying debt" between the accord
investors and Anglo-Dutch and that the three release investors--Prosperity, Press,
and Anzar--"released [Anglo-Dutch] by separate release agreements." Additionally,
the trial court granted Anglo-Dutch's no-evidence summary judgment motions on all
of the investors' tort and statutory claims "other than fraud in the inducement." The
trial court also granted Van Dyke summary judgment "on all claims." However, the
trial court stated that the three release investors had raised a "material issue of fact"
as to whether they had been "induced by fraud" to enter the settlement and release
agreements. Thus, the trial court denied Anglo-Dutch summary judgment on the
release investors' fraudulent inducement claims with respect to the settlement and
release agreements. 

 In sum, in its summary judgment order, the trial court granted Anglo-Dutch and
Van Dyke summary judgment against all investors and on all claims, except for the
release investors' claims against Anglo-Dutch for fraud in the inducement to enter the
settlement and release agreements. The trial court, in a separate order, severed the
three release investors' fraudulent inducement claims into a separate action. The 
accord investors did not assert any similar fraudulent inducement claims with regard
to the accord and satisfaction agreements, and, accordingly, none of their claims were
severed into the separate action. (8)

Standard of Review

 The movant for summary judgment has the burden of showing that there is no
genuine issue of material fact and that it is entitled to summary judgment as a matter
of law. Tex. R. Civ. P. 166a(c); Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548
(Tex. 1985). A plaintiff moving for summary judgment on its claim must establish
its right to summary judgment by conclusively proving all the elements of its cause
of action as a matter of law. Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 223 (Tex.
1999); Anglo-Dutch Petroleum Int'l, Inc. v. Haskell, 193 S.W.3d 87, 95 (Tex.
App.--Houston [1st Dist.] 2006, pet. denied). 

 When a defendant moves for summary judgment, it must either (1) disprove at
least one element of the plaintiff's cause of action or (2) plead and conclusively
establish each essential element of its affirmative defense, thereby defeating the
plaintiff's cause of action. Cathey v. Booth, 900 S.W.2d 339, 341 (Tex. 1995);
Yazdchi v. Bank One, Tex., N.A., 177 S.W.3d 399, 404 (Tex. App.--Houston [1st
Dist.] 2005, pet. denied). When deciding whether there is a disputed, material fact
issue precluding summary judgment, evidence favorable to the non-movant will be
taken as true. Nixon, 690 S.W.2d at 548-49; Yazdchi, 177 S.W.3d at 403-04. Every
reasonable inference must be indulged in favor of the non-movant and any doubts
must be resolved in its favor. Nixon, 690 S.W.2d at 548-49; Yazdchi, 177 S.W.3d at
403-04. 

 To prevail on a no-evidence summary judgment motion, a movant must allege
that there is no evidence of an essential element of the adverse party's cause of action.
Tex. R. Civ. P. 166a(i); Fort Worth Osteopathic Hosp., Inc. v. Reese, 148 S.W.3d 94,
99 (Tex. 2004). We review a no-evidence summary judgment under the same legal
sufficiency standard used to review a directed verdict. Gen. Mills Rests., Inc. v. Tex.
Wings, Inc., 12 S.W.3d 827, 832-33 (Tex. App.--Dallas 2000, no pet.). Although
the non-moving party is not required to marshal its proof, it must present evidence
that raises a genuine issue of material fact on each of the challenged elements. Tex.
R. Civ. P. 166a(i); Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 600 (Tex. 2004). 
A no-evidence summary judgment motion may not properly be granted if the
non-movant brings forth more than a scintilla of evidence to raise a genuine issue of
material fact on the challenged elements. Ridgway, 135 S.W.3d at 600. More than
a scintilla of evidence exists when the evidence "rises to a level that would enable
reasonable and fair-minded people to differ in their conclusions." Merrell Dow
Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997).

Accord and Satisfaction

 In their second issue, the investors contend that the trial court erred in granting
summary judgment in Anglo-Dutch's favor as to the accord investors' breach of
contract claims on the ground of accord and satisfaction. The investors assert that the
trial court "took as true the testimony of Van Dyke" and that fact issues exist as to
whether the parties had "a legitimate or bona fide dispute," Anglo-Dutch acted in
good faith, and the accords were supported by consideration.

 As a preliminary matter, the accord investors contend that the trial court
granted Anglo-Dutch summary judgment on its affirmative defenses of accord and
satisfaction and release only as to the investors' breach of contract claims. The
investors assert that Anglo-Dutch did not seek summary judgment on its affirmative
defenses as to their tort and statutory claims. They note that the trial court also
disposed of their tort and statutory claims in granting Anglo-Dutch's no evidence
summary judgment motions on these claims. 

 Our review of the record reveals that Anglo-Dutch sought summary judgment
on the grounds of accord and satisfaction and release as to all of the accord investors'
claims. It is true that at the time Anglo-Dutch filed its original summary judgment
motion, the investors had only pleaded breach of contract claims. However, once the
investors added their tort and statutory claims, Anglo-Dutch filed supplemental
summary judgment motions on the grounds of accord and satisfaction and release. 
Anglo-Dutch did not limit these supplemental motions solely to the investors'
contract claims. Rather, the motions apply to all of the investors' claims, including
their tort and statutory claims. Furthermore, the trial court did not state in its order
that it granted Anglo-Dutch summary judgment on the basis of accord and
satisfaction and release only as to the investors' breach of contract claims. Instead,
the trial court, in its order, granted Anglo-Dutch summary judgment on these grounds
without any express limitation. In granting Anglo-Dutch's no evidence summary
judgment motions, the trial court could simply have been providing an alternative
means to dispose of the investors' tort and statutory claims. Accordingly, we reject
the investors' procedural challenge to the application of Anglo-Dutch's affirmative
defense of accord and satisfaction and release as to their tort and statutory claims. 

 In regard to whether the affirmative defenses may properly be applied to bar
non-contractual claims, Texas courts have noted that "[c]laims arising out of the
commission of a tort are particularly applicable subjects for accord and satisfaction." 
Marsalis v. Garre, 391 S.W.2d 522, 525 (Tex. Civ. App.--Amarillo 1965, writ ref'd
n.r.e.); see also Lopez v. Munoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 863-64
(Tex. 2000) (suggesting that accord and satisfaction may bar tort claims, including
claims for breach of fiduciary duty, but ultimately holding facts did not support
defense). The investors have not cited any authority for the proposition that such
defenses apply only to bar their contractual claims. In fact, allowing a party to escape
the effect of entering into an accord and satisfaction agreement by simply pleading
non-contractual claims, even when such claims arise out of a dispute that the parties
intended to settle by entering into the accord, would defeat the very purpose of this
method of dispute resolution, which has long been recognized by the common law
and our Legislature. See Tex. Bus. & Com. Code Ann. § 3.311 (Vernon 2002). 
Accordingly, we will consider the propriety of the trial court's order granting of
summary judgment on the ground of accord and satisfaction as to all of the accord
investors' claims. 

 The common law defense of accord and satisfaction "rests upon a contract,
express or implied, in which the parties agree to the discharge of an existing
obligation by means of a lesser payment tendered and accepted." See Lopez, 22
S.W.3d at 863; Jenkins v. Henry C. Beck Co., 449 S.W.2d 454, 455 (Tex. 1969). 
"The evidence must establish an assent of the parties to an agreement that the amount
paid by the debtor to the creditor was in full satisfaction of the entire claim." Jenkins,
449 S.W.2d at 455; Hycarbex, Inc. v. Anglo-Suisse, Inc., 927 S.W.2d 103, 108 (Tex.
App.--Houston [14th Dist.] 1996, no writ). There must be an unmistakable
communication to the creditor that tender of the lesser sum is upon the condition that
acceptance will constitute satisfaction of the underlying obligation. Lopez, 22 S.W.3d
at 863; Ostrow v. United Bus. Machs., Inc., 982 S.W.2d 101, 104 (Tex.
App.--Houston [1st Dist.] 1998, no pet.); Hycarbex, Inc., 927 S.W.2d at 108. The
condition must be plain, definite, and certain and "the statement accompanying the
tender of a sum less than the contract price must be so clear, full, and explicit that it
is not susceptible of any other interpretation." Jenkins, 449 S.W.2d at 455; Hycarbex,
Inc., 927 S.W.2d at 108. 

 An accord and satisfaction of a money demand may occur on payment of an
amount less than the creditor contends is due when the claim is unliquidated or when
there is a dispute between the parties as to the liability on a liquidated claim. See Ind.
Lumbermen's Mut. Ins. Co. v. State, 1 S.W.3d 264, 266 (Tex. App.--Fort Worth
1999, pet. denied); Hixson v. Cox, 633 S.W.2d 330, 331 (Tex. App.--Dallas 1982,
writ ref'd n.r.e.). However, a valid accord and satisfaction requires that there initially
be a legitimate dispute between the parties about what was expected. Lopez, 22
S.W.3d at 863; Ostrow, 982 S.W.2d at 104. 

 Texas has adopted the Uniform Commercial Code's ("UCC") provisions on
accord and satisfaction, which are consistent with the Texas courts' recognition of the
common law doctrine of accord and satisfaction. (9) Tex. Bus. & Com. Code Ann.
§ 3.311 (Vernon 2002). Section 3.311 provides that a "claim is discharged if the
person against whom the claim is asserted proves that the instrument or an
accompanying written communication contained a conspicuous statement to the effect
that the instrument was tendered in full satisfaction of the claim" and that, 

(1) that person in good faith tendered an instrument to the claimant
as full satisfaction of the claim;


(2) the amount of the claim was unliquidated or subject to a bona fide
dispute; and


(3) the claimant obtained payment of the instrument.


 Id. § 3.311(a)-(b).

 In regard to the investors' challenges to the existence of a "bona fide dispute,"
we note that here the parties' accord, which in this case was contained in a written
agreement, "is in essence a contract or agreement" and "the rules of construction
applicable to contracts apply." Hycarbex, Inc., 927 S.W.2d at 108. Thus, our
"primary concern is to ascertain the true intentions of the parties as expressed in the
[written] instrument." Id.; see also AXA S.A. v. Union Pac. R.R. Co., 269 F. Supp. 2d
863, 867 (S.D. Tex. 2003) (stating that when contract is unambiguous, instrument
alone will be deemed express intent of parties and court will not look beyond four
corners of instrument and that if creditor obviously should understand that check is
tendered in full satisfaction then acceptance will be binding regardless of creditor's
actual understanding). The April 23, 2004 letters Anglo-Dutch sent the investors
plainly disclosed Anglo-Dutch's assertions that the investment agreements were
contrary to Texas public policy, unenforceable under Texas law, and otherwise
invalid. The letters stated, in no uncertain terms, that notwithstanding these
contentions, and "in an effort to compromise any dispute," Anglo-Dutch tendered
enclosed checks containing "less than the amount called for" under the investment
agreements. The letters emphasized, by using bold and underlined text, that by
depositing the enclosed checks, the investors would be releasing Anglo-Dutch from
liability and that an accord and satisfaction would occur. The checks attached to the
letters contained unmistakable accord and satisfaction language on both the front and
the back. 

 After receiving the April 23, 2004 letters, stating that Anglo-Dutch disputed
the validity of the investment agreements, all of the accord investors signed and
deposited the enclosed checks. See Indus. Life Ins. Co. v. Finley, 382 S.W.2d 100,
106 (Tex. 1964) (stating that notation on check and statement of basis of tender in
transmittal letter were clear and unequivocal offer of accord); AXA S.A., 269 F. Supp.
2d at 867 (noting that letter accompanying settlement check included conspicuous
statement that instrument was tendered in full satisfaction and that pertinent language
describing enclosed check as limit of liability was on front of one-page letter and "not
hidden within boilerplate language or mislabeled headings" and concluding that
defendant established defense of accord and satisfaction as matter of law). 
Furthermore, the enclosed checks referenced, in all capital letters, section 3.311 and
repeatedly stated that Anglo-Dutch's payment was being tendered in full satisfaction
of all amounts due under the investment agreements--the validity of which Anglo-Dutch was disputing. See Ostrow, 982 S.W.2d at 104 ("When a check listing certain
conditions is tendered to a party and the conditions are accepted, a contract is formed
when the check is cashed or deposited."). 

 None of the investors presented any evidence disputing that they received the
April 23, 2004 letters communicating Anglo-Dutch's position regarding the
enforceabilty of the investment agreements. For example, the summary judgment
record contains testimony from multiple investors acknowledging that the letters
unambiguously communicated Anglo-Dutch's position. In fact, some of the investors
admitted to consulting with counsel prior to accepting the checks with the accord and
satisfaction language. One of the investors deposited the check only after disputing
Anglo-Dutch's accord and satisfaction language by stating, "With all rights reserved
against all Parties and under protest." (10) This protest language provides additional
evidence that the investors were aware of Anglo-Dutch's position as stated in its
April 23, 2004 letters.

 Other summary judgment evidence, beyond the plain terms of the accord itself, 
also establishes the existence of a bona fide or legitimate dispute. Van Dyke testified
that in the first half of April 2004, apparently after his initial April 12 correspondence
to investors, and following consultations with his lawyer, he concluded that the
investment agreements violated Texas public policy and were unenforceable. Van
Dyke conceded that although he is "not a lawyer or an expert on the law of contracts,
securities, usury, or Texas public policy," both he and Anglo-Dutch maintained a
reasonable belief that Anglo-Dutch would prevail on its claims that the investment
agreements violated Texas public policy and were invalid. Thus, according to Van
Dyke, "Anglo-Dutch disputed its liability . . . in good faith on April 23, 2004." 

 We further note that at the time Anglo-Dutch disputed its liability, no Texas
court had yet addressed similar challenges to litigation funding agreements in Texas. 
See Haskell, 193 S.W.3d at 100. Additionally, courts in other states had found certain
types of litigation funding agreements to be unenforceable. Id. at 100 (citing Lawsuit
Fin., L.L.C. v. Curry, 261 Mich. App. 579, 683 N.W.2d 233 (2004) and Rancman v.
Interim Settlement Funding Corp., No. 20523, 2001 WL 1339487, at *3 (Ohio Ct.
App. Oct. 31, 2001) (not designated for publication)). 

 Additionally, the deposition testimony from multiple investors in this case
establishes that the investors had reason to be aware of these decisions from other
jurisdictions and to anticipate at least some measure of risk regarding the
enforceabilty of the investment agreements. Specifically, Dinardo, both an individual
investor and a corporate representative for Plaintiff Support, testified,

[Anglo-Dutch]: And Mr. Van Dyke, on behalf of Anglo-Dutch,
raised in this letter that he felt like the claims
investment agreements were--violated Texas public 
policy and were unenforceable and void, correct?


[Dinardo]: He said that, yes.


[Anglo-Dutch]: So he raised, at least in this letter, a dispute as to the
validity of the contracts?


[Dinardo]: Yes, for the first time.


. . . .


[Anglo-Dutch]: So you read this letter, and he has language in here
that is basically offering to you a settlement or a new
contract, right?


[Dinardo]: Correct.


[Anglo-Dutch]: But you would agree with me that at least as of
today it's not really settled law in a lot of the states
whether or not these types of agreements are going
to be found enforceable, correct?


. . . .


[Dinardo]: And those are the states we don't do business in,
correct.


[Anglo-Dutch]: Well, there's a lot of states where you don't have,
for example, supreme court opinion these
specifically are [] enforceable?


[Dinardo]: You're right.


. . . .


[Anglo-Dutch]: You knew the risk was there?


 . . . .


 That the contract could be held unenforceable?


. . . .


[Dinardo]: I think that is an element of the business, yes.


[Anglo-Dutch]: We've talked about, you know, the possibilities at
least in certain states in certain circumstances these
contracts would be considered usury and therefore
violate usury law, right?


[Dinardo]: Yes.


. . . .


[Anglo-Dutch]: And again, you know that there's a risk out there and
that some state or some judge could hold these
contracts invalid or unenforceable due to public
policy?


[Dinardo]: On a state-by-state basis, that's correct.


 In response to the above summary judgment evidence, the investors cite to
evidence showing that Anglo-Dutch, in an attempt to accomplish its settlement with
Halliburton after obtaining a "significantly lower than expected" judgment, solicited
the investors to take reduced payouts with the motivation that it wanted to retain more
of the settlement funds. But this evidence, indicating only that Anglo-Dutch sought
to reduce its liabilities and better its economic standing, does not defeat the summary
judgment evidence that, on April 23, 2004, Anglo-Dutch presented a legitimate and
bona fide dispute as to the validity of the investment agreements on public policy
grounds and that Anglo-Dutch clearly communicated this dispute to the investors.

 In regard to the issue of good faith, the comments to section 3.311 define "good
faith" to mean "not only honesty in fact, but the observance of reasonable commercial
standards of fair dealing." Tex. Bus. & Com. Code Ann. § 3.311, cmt. 4. The
comments further note that the "meaning of 'fair dealing' will depend upon the facts
in the particular case." Id. The comments provide two examples of a lack of good
faith. Id. First, when an insurer takes unfair advantage of a claimant by tendering a
settlement check for "a claim for personal injury in an accident clearly covered by the
insurance policy" and the "claimant is necessitous and the amount of the check is very
small in relationship to the extent of the injury and the amount recoverable." Id.
(emphasis added). On those facts, if "the insurer was taking unfair advantage of the
claimant, an accord and satisfaction would not result from payment of the check
because of the absence of good faith by the insurer in making the tender." Id. 
Second, "lack of good faith is found in the practice of some business debtors in
routinely printing full satisfaction language on their check stocks so that all or a large
part of the debts of the debtor are paid by checks bearing the full satisfaction
language, whether or not there is any dispute with the creditor." Id. "Under such a
practice the claimant cannot be sure whether a tender in full satisfaction is or is not
being made." Id. "Use of a check on which full satisfaction language was affixed
routinely pursuant to such a business practice may prevent an accord and satisfaction
on the ground that the check was not tendered in good faith." Id. 

 Neither of these examples is comparable to the facts of this case. Here, we
cannot say that Anglo-Dutch's challenge to the validity of the agreements was
frivolous or completely without merit. Additionally, the record contains no evidence
that would support a finding that, like an insurer taking unfair advantage of a needy
claimant who was clearly covered by an insurance policy, Anglo-Dutch was taking
advantage of the accord investors. See Gen. Am. Life Ins. Co. v. Valley Feed Mills,
Inc., 458 S.W.2d 860, 862 (Tex. Civ. App.--El Paso 1970, writ ref'd n.r.e.)
(indicating that accord and satisfaction would not be available defense if denial of
claim is "factitious or mala fides"). Furthermore, the record contains no evidence that
the language in the April 23, 2004 letters and the enclosed checks was merely
boilerplate and included by Anglo-Dutch as a routine business practice. Instead, the
checks contained conspicuous language, and the checks were accompanied with
cover letters clearly setting forth Anglo-Dutch's dispute regarding the validity of the
investment agreements and an offer to settle the dispute.

 Other evidence concerning representations made to and relied upon by the
release investors is largely unrelated to the April 23, 2004 letters containing the
accord and satisfaction language, which is the focus of our inquiry. See Hycarbex,
Inc., 927 S.W.2d at 108; AXA S.A., 269 F. Supp. 2d at 867. For example, the accord
investors cite evidence regarding specific representations made by Anglo-Dutch and
relied upon by the release investors, both in the April 12, 2004 letters and in separate
conversations, inducing the release investors to enter into the settlement and release
agreements. Also, the accord investors cite evidence showing that Anglo-Dutch
contacted the release investors and told them that, in order to obtain a settlement with
Halliburton, all investors would have to accept the deal or get nothing and that many
or all of the other investors had already agreed to take discounted payments. But
whatever representations were made to and relied upon by the release investors in
entering into the settlement and release agreements, the accord investors did not enter
into similar settlement and release agreements. We also note that the release
investors' fraudulent inducement claims arising out of these alleged
misrepresentations made to induce the release investors to enter into the settlement
and release agreements have been severed into a separate action.

 Thus, even though there is some evidence showing that Anglo-Dutch had
previously, and possibly falsely, represented that it needed all of the investors to
accept reduced payments so that it could accomplish a settlement with Halliburton,
Anglo-Dutch disclosed in the first line of its April 23, 2004 letters that it had in fact
settled the Halliburton lawsuit on April 16, 2004. This disclosure rendered any prior
representations regarding its need for all of the investors to accept reduced payments
to effectuate a settlement with Halliburton immaterial to the accord investors'
decision to accept the settlement checks with the accord and satisfaction language. 
In sum, evidence regarding the previous representations made in an attempt to induce
the investors to take reduced payments to enable Anglo-Dutch to settle with
Halliburton in exchange for the promise of a quick payout does not create a fact issue
as to whether the accord investors were put on notice of a legitimate or bona fide
dispute as to the enforceabilty of the investment agreements in the April 23, 2004
letters.

 Similarly, the investors' argument that there can be no legitimate or bona fide
dispute because this Court rejected "every assertion" made by Anglo-Dutch regarding
the validity of the investment agreements in Haskell does not raise a fact issue as to
whether Anglo-Dutch, in good faith, raised a legitimate or bona fide dispute in its
April 23, 2004 letter. In evaluating the existence of a bona fide dispute or the good
faith of Anglo-Dutch, we do not consider whether Anglo-Dutch's arguments
ultimately proved wrong. See Vann v. W. Data Ctrs., Inc., 532 S.W.2d 419, 421 (Tex.
Civ. App.--Amarillo 1976, no writ) (stating that it was unnecessary to decide
defendant's actual liability, bona fide dispute made it immaterial as to what plaintiffs
were otherwise entitled to receive, and that when defendant "explained its position
and offered its check with the release affixed in full satisfaction" plaintiffs knew
defendant was disputing its liability on claims and was making unequivocal offers of
lesser amount in full and final settlement); Gen. Am. Life Ins. Co., 458 S.W.2d at 862
(stating that "validity of the accord and satisfaction is not affected by the fact that the
party who claimed that nothing is due, or that the true sum was less than that claimed
by the other party, is subsequently shown to have been in error"). Here, regardless
of whether the investment agreements were ultimately deemed to be enforceable, at
the time the accord investors chose to accept the settlement checks, they accepted the
terms of the accord "unaffected by their belief" that Anglo-Dutch's contentions
lacked merit. See Vann, 532 S.W.2d at 422. 

 We conclude that the investors' evidence does not create a fact issue as to
whether the parties had "a legitimate or bona fide dispute" or whether Anglo-Dutch
acted in good faith at the time Anglo-Dutch sent the April 23, 2004 letters and the
investors accepted the tendered checks. 

 In regard to the investors' claim that the new agreements were not supported
by consideration, Texas law is clear that a "good faith dispute as to liability on either
a liquidated or unliquidated claim furnishes sufficient consideration for an accord and
satisfaction," and the satisfaction is the "actual performance of the new agreement." 
Hycarbex, Inc., 927 S.W.2d at 110; Ind. Lumbermen's Mut. Ins. Co., 1 S.W.3d at 266. 
In determining whether an accord and satisfaction is supported by consideration, "it
is not necessary to resolve the parties' underlying dispute." Hycarbex, Inc., 927
S.W.2d at 110. Rather, consideration "is found in the resolution of the uncertainty
which exists as to the validity or the amount of a claim" and "the very existence of
the dispute is the consideration for the accord and satisfaction." Id. Because the
summary judgment evidence establishes that Anglo-Dutch communicated its bona
fide dispute to the investors in its April 23, 2004 letters, we conclude that the new
agreements were supported by consideration. See id.

 Finally, the investors argue that Anglo-Dutch's accord and satisfaction defense
fails because the investors' claims are liquidated. Both the common law standard and
section 3.311 make clear that an accord and satisfaction may arise in the context of
a liquidated claim. See Ind. Lumbermen's Mut. Ins. Co., 1 S.W.3d at 266 (stating that
accord and satisfaction may occur when claim is unliquidated or when there is dispute
between parties as to liability on liquidated claim); Tex. Bus. & Com. Code Ann. §
3.311 (stating that amount of the claim must be "unliquidated or subject to a bona
fide dispute") (emphasis added) .

 We hold that Anglo-Dutch established, as a matter of law, its affirmative
defense of accord and satisfaction as to the accord investors' claims. Accordingly,
we further hold that the trial court did not err in granting summary judgment in
Anglo-Dutch's favor as to all of the accord investors' claims on the ground of accord
and satisfaction.

 We overrule the investors' second issue.


Release

 In their third issue, the investors contend that the trial court erred in granting
summary judgment in Anglo-Dutch's favor as to the release investors on the ground
of release. 

 The summary judgment evidence establishes that on or about April 12, 2004,
prior to finalizing a settlement with Halliburton and obtaining any cash recovery, Van
Dyke sent the investors letters "respectfully requesting" them to accept reduced
payments and attaching proposed settlement and release agreements. The letters
stated that the trial court in the Halliburton lawsuit signed a judgment that
"significantly reduced the value" of the judgment. The letters also noted that recent
developments in Texas law, subsequent to the trial court's entry of its judgment, had
"impacted Anglo-Dutch's position with respect to the appeals process and the
settlement of the Lawsuit." As such, and "[i]n light of current Texas law," Anglo-Dutch expressed its "strong desire" to settle, and Anglo-Dutch also noted
Halliburton's "willingness to settle," but for "a significantly lower amount than what
we ever expected." Anglo-Dutch asserted that "to achieve a resolution of the Lawsuit
with Halliburton," it needed "everyone" to accept discounted payments. In sum, the
letters made clear that the investors were being asked to accept discounted payments
to avoid any risks associated with the enforceability of the judgment and to obtain a
quick payout. 

 Only the three release investors signed and returned the settlement and release
agreements, which provided that "[t]o induce Anglo-Dutch to accept settlement terms
substantially less than Anglo-Dutch had anticipated to receive and/or to help facilitate
an early payment between Anglo-Dutch and the defendants in the [Halliburton
lawsuit] . . . Investor agrees to accept a lower payment from Anglo-Dutch than what
is provided for in the Investment Agreements." Thus, each settlement and release
agreement specifically provided that its execution would induce settlement and
facilitate "early payment." Each settlement and release agreement provided a sum
certain that Anglo-Dutch would pay the investors and a date certain by which it
would make the payment. The settlement and release agreements also recited that
they were being made "for good and valuable consideration." Furthermore, the
settlement and release agreements stated that the investment agreements "shall
terminate" and that Anglo-Dutch was released from any and all obligations with
respect to the investment agreements. 

 Here, the release investors entered into the settlement and release agreements
before Anglo-Dutch's settlement with Halliburton and at a time when there was some
concern about the prospect of the appeals process and the ultimate recovery. The
release investors signed the settlement and release agreements to avoid any of the
uncertainty and to ensure a prompt payout on a date certain and of a sum certain.
Thus, the settlement and release agreements were supported by consideration. See
Hycarbex, Inc., 927 S.W.2d at 110 (noting that consideration "is found in the
resolution of the uncertainty which exists as to the validity or the amount of a
claim"). (11) 

 Accordingly, we hold that the trial court did not err in granting summary
judgment in Anglo-Dutch's favor as to all of the release investors' claims on the
ground of release. (12)

 We overrule the investors' third issue.

Collateral Estoppel

 In their fourth and fifth issues, the investors contend that the trial court erred
in failing to apply the doctrine of collateral estoppel as to Anglo-Dutch's accord and
satisfaction and release defenses and as to the investors' tort and statutory claims
"given that [Anglo-Dutch] litigated and lost identical factual issues in a [separate]
bench trial before Judge [Lamar] McCorkle involving another investor." Collateral estoppel can be applied offensively or defensively. Yarbrough's
Dirt Pit, Inc. v. Turner, 65 S.W.3d 210, 216 (Tex. App.--Beaumont 2001, no pet.). 
A plaintiff uses offensive collateral estoppel when he seeks to estop a defendant from
relitigating an issue that the defendant previously litigated and lost in a suit involving
another party. See id. To establish collateral estoppel or issue preclusion, the
claimant must show: (1) the facts sought to be litigated in the second action were
fully and fairly litigated in the first action, (2) those facts were essential to the
judgment in the first action, and (3) the parties were cast as adversaries in the first
action. Tex. Dep't of Pub. Safety v. Petta, 44 S.W.3d 575, 579 (Tex. 2001); Turnage
v. JPI Multifamily, Inc., 64 S.W.3d 614, 617 (Tex. App.--Houston [1st Dist.] 2001,
no pet.). 

 In regard to the application of collateral estoppel on Anglo-Dutch's affirmative
defenses of accord and satisfaction and release, the investors cite the following
findings of fact from the other trial court in the Smith case:

 58. Moreover, there was no consideration for any proposed settlement
agreement between Smith and Anglo-Dutch;


 59. At the time Anglo-Dutch requested Smith and other investors to
take less than was set forth in the contracts, there was no bona
fide dispute between Anglo-Dutch and the investors, including
Smith.

 However, in addition to the above findings, the trial court further found in
Smith,

55. Smith has never executed a settlement agreement in connection
with his claims against Anglo-Dutch.


56. No final settlement agreement was ever agreed upon by Smith and
Anglo-Dutch.


57. In any event, Anglo-Dutch withdrew all settlement offers that it
had ever made to Smith.


Thus, unlike the investors in this case, Smith neither signed a settlement and release
agreement nor accepted a check with accord and satisfaction language. Only after
making the above critical findings, did the trial court in Smith find, with a qualifying
"moreover," that there was no consideration or a bona fide dispute. In addition to
these key differences between this case and Smith, it appears that although Anglo-Dutch pleaded the affirmative defense of release in Smith, it did not, at any time,
assert the affirmative defense of accord and satisfaction. Of course, there would have
been no basis to assert such a defense in Smith since Smith, as evidenced by the trial
court's findings, did not accept the April 23, 2004 check with the clear and
unmistakable accord and satisfaction language. 

 Even if the investors' and Smith's investment agreements and breach of
contract claims were effectively identical, and even if Anglo-Dutch had pleaded
counterclaims for breach of contract in this case and Smith, the summary judgment
record does not conclusively establish that the issues of "bona fide dispute" and
"consideration," as those issues are raised in this case, were fully and fairly litigated
in Smith. Additionally, since it was found in Smith that there was never any
settlement or release between Anglo-Dutch and Smith, any findings regarding the
existence of a bona fide dispute or the lack of consideration were not essential to the
judgment. See French v. Gill, 206 S.W.3d 737, 745 (Tex. App.--Texarkana 2006,
no pet.) (stating that "the general rule is that there cannot be estoppel by alternative
holdings"); see also Restatement (Second) of Judgments § 27 cmt. i (1982) ("If
a judgment of a court of first instance is based on determinations of two issues, either
of which standing independently would be sufficient to support the result, the
judgment is not conclusive with respect to either issue standing alone."); Cf.Johnson
& Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 522 (Tex. 1998)
(concluding that "alternative findings that are in fact reviewed and affirmed by an
appellate court may have preclusive effect"). Accordingly, we hold that the trial court
did not err in refusing to apply the doctrine of collateral estoppel as to Anglo-Dutch's
accord and satisfaction and release defenses. 

 We overrule the investors' fourth issue.

 Having held that the trial court did not err in refusing to apply the doctrine of
collateral estoppel as to Anglo-Dutch's accord and satisfaction and release defenses,
that Anglo-Dutch established as a matter of law its accord and satisfaction and release
defenses, and that such defenses applied to all of the investors' claims, we need not
consider the investors' fifth issue regarding the application of collateral estoppel on
the investors' tort and statutory claims. We also need not consider the investors' first
issue, in which they argue that the trial court erred in granting Anglo-Dutch's no-evidence summary judgment motions on the investors' tort and statutory claims. 

Claims Against Van Dyke Individually

 In their sixth issue, the investors contend that the trial court erred in granting
summary judgment in favor of Van Dyke as to all of the investors' claims. Based on
the rule that corporate agents are personally liable for fraudulent or tortious acts
committed while in the service of their corporation, (13) the investors assert that because
the summary judgment evidence shows that every fraudulent or tortious act was
performed by Van Dyke, it follows that fact issues exist as to their tort and statutory
claims against Van Dyke individually for the same reasons that fact issues exist as to
their claims against the corporate Anglo-Dutch defendants. The investors do not
assert that the terms of the settlement and release agreements or the accord are
insufficient to release any claims that the investors had against Van Dyke in his
individual capacity. 

 Having held that Anglo-Dutch established as a matter of law its accord and
statisfaction and release defenses and that such defenses apply to all of the investors'
claims, we further hold, for the same reasons set forth above, and based on the
affirmative defenses of accord and satisfaction and release, that the investors did not
present fact issues as to these same claims against Van Dyke in his individual
capacity. 

 We overrule the investors' sixth issue.



Conclusion


 In light of our holding that the trial court did not err in refusing to apply the
doctrine of collateral estoppel as to Anglo-Dutch's accord and satisfaction and release
defenses, that Anglo-Dutch established as a matter of law its accord and satisfaction
and release defenses, and that such defenses applied to all of the investors' claims,
we need not consider Anglo-Dutch's cross-appeal. 

 We affirm the judgment of the trial court. 



 Terry Jennings

 Justice


Panel consists of Justices Taft, Jennings, and Alcala.
1. See Tex. R. Civ. P. 166a(c), (i).
2. Tex. Pen. Code Ann. § 32.45 (Vernon Supp. 2006).
3. See Smith v. Anglo-Dutch Petroleum Int'l, Inc., No. 2004-48332 (133rd Dist. Ct.,
Harris County, Tex. March 13, 2006). We note that in the event Smith is reversed,
there will no longer be a final judgment in that case on which collateral estoppel could
be based. See J.J. Gregory Gourmet Servs., Inc. v. Antone's Import Co., 927 S.W.2d
31, 34 (Tex. App.--Houston [1st Dist.] 1995, no writ). 
4. We need only reach Anglo-Dutch's cross-appeal if we conclude that the trial court
erred in granting Anglo-Dutch's summary judgment motion on its affirmative
defenses of accord and satisfaction and release. As Anglo-Dutch concedes, this
Court, in a case involving other investors who invested monies with Anglo-Dutch
under investment agreements nearly identical to those involved in the instant case, has
previously rejected Anglo-Dutch's contentions that these investment agreements are
unenforceable on grounds of usury, securities law violations, and public policy. See
generally Anglo-Dutch Petroleum Int'l, Inc. v. Haskell, 193 S.W.3d 87 (Tex.
App.--Houston [1st Dist.] 2006, pet. denied). As further explained, however, our
opinion in Haskell does not control our consideration of Anglo-Dutch's affirmative
defenses in this case because none of the investors in Haskell executed a settlement
and release agreement or accepted a check with accord and satisfaction language.
5. Anglo-Dutch (Tenge) LLC et al. v. Ramco Oil & Gas, Ltd. et al., No. 2000-22588
(61st Dist. Ct., Harris County, Tex.). 
6. The investors further alleged in their petition that although Anglo-Dutch "settled [its]
suit against Halliburton for a substantial sum," Anglo-Dutch "refused to pay all sums
owed to [the investors] under their [investment agreements]" and that after its
settlement with Halliburton, Anglo-Dutch "falsely informed some or all of [the
investors] that many or all of the [other] investors had agreed to accept lower amounts
than was owed under [the investment agreements] and, thereby, induced some or all
of [the investors] to accept lesser amounts than was owed to them under their own
[investment agreements]." 
7. Although the investment agreements differed in some respects, including the amount
of the investment and any return, all of the agreements were similarly structured. 
Also, the formula used to calculate the "Investor's Total Return" varied from
agreement to agreement, but the "driving factor" in determining the return was the
amount of time that had elapsed from the date of the investment.
8. Both the release investors and the accord investors asserted fraud and fraudulent
inducement claims regarding the original investment agreements. These claims were
fully disposed of by the trial court's summary judgment order. As noted above, the
release investors also asserted fraudulent inducement claims related to the settlement
and release agreements, and these are the claims that were severed. The accord
investors' did not assert fraudulent inducement claims regarding the accord and
satisfaction agreements, and the trial court, in its order, did not permit the accord
investors to proceed in the severed action.
9. See Tex. Bus. & Com. Code Ann. § 3.311, cmt. 3 (Vernon 2002) ("Section 3-311 is
based on a belief that the common law rule produces a fair result and that informal
dispute resolution by full satisfaction checks should be encouraged.").
10. Under Texas law, any such language is ineffective, and a creditor is required to return
the check without cashing it. See Ind. Lumbermen's Mut. Ins. Co. v. State, 1 S.W.3d
264, 267 (Tex. App.--Fort Worth 1999, pet. denied); see also Hixson v. Cox, 633
S.W.2d 330, 331 (Tex. App.--Dallas 1982, writ ref'd n.r.e.) ("Acceptance of a lesser
amount, even under protest, . . . results in an accord and satisfaction which is binding
on the creditor and precludes recovery for any unpaid amount."); Tex. Bus. & Com.
Code Ann. § 3.311, cmt. 2 (noting that "[u]nder the common law rule the seller can
refuse the check or can accept it subject to the condition stated by the buyer, but the
seller can't accept the check and refuse to be bound by the condition). 
11. Rather than address any of the above evidence, as their sole argument that the trial
court erred in granting summary judgment on the ground of release, the investors cite
the other trial court's finding of fact in Smith--a case involving another investor,
Smith, who is not a party to this appeal. Specifically, the investors cite the trial
court's finding in Smith that "there was no consideration for any proposed settlement
agreement between Smith and Anglo-Dutch." The investors assert that this finding
"at a minimum raises a fact issue as to whether the releases are supported by
consideration and therefore enforceable irrespective of whether Press, Anzar, and
Prosperity were fraudulently induced to sign them." 


 However, as Anglo-Dutch notes, in Smith, the trial court also made findings of fact
that Smith never signed a settlement agreement with Anglo-Dutch and that Anglo-Dutch withdrew all settlement offers. Thus, the trial court's finding that the investor
in Smith--who is not a party to this appeal--received no consideration from a
settlement agreement, does not raise a fact issue on Anglo-Dutch's affirmative
defense of release in this case.
12. As with Anglo-Dutch's affirmative defenses of accord and satisfaction, we conclude
that Anglo-Dutch sought summary judgment on the affirmative defense of release as
to all of the release investors' claims--contract, tort, and statutory. Thus, we consider
the propriety of the trial court's order granting summary judgment on the ground of
release as to all of the release investors' claims.
13. See Centurion Planning Corp., Inc. v. Seabrook Venture II, 176 S.W.3d 498, 509
(Tex. App.--Houston [1st Dist.] 2004, no pet.).